[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 650.]

THE STATE OF OHIO, APPELLANT, *v*. ROBINETTE, APPELLEE.

[Cite as *State v. Robinette*, 1995-Ohio-162.]

*Criminal law—Motor vehicles—Continued detention of a person stopped for a traffic violation constitutes an illegal seizure, when—Police officer required to inform motorist that his legal detention has concluded before the police officer may engage in any consensual interrogation.*

1. When the motivation behind a police officer's continued detention of a person stopped for a traffic violation is not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure.

2. The right, guaranteed by the federal and Ohio Constitutions, to be secure in one's person and property requires that citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase "At this time you legally are free to go" or by words of similar import.

(No. 94-1143—Submitted May 24, 1995—Decided September 6, 1995.)

*Appeal* from the Court of Appeals for Montgomery County, No. 14074.

————————

{¶ 1} On August 3, 1992, appellee, Robert D. Robinette, was driving his car at sixty-nine miles per hour in a forty-five miles per hour construction zone on Interstate 70 in Montgomery County. Deputy Roger Newsome of the Montgomery

County Sheriff's office, who was on drug interdiction patrol at the time, stopped Robinette for a speeding violation.

{¶ 2} Before Newsome approached Robinette's vehicle, he had decided to issue Robinette only a verbal warning, as was his routine practice regarding speeders in that particular construction zone. Newsome approached Robinette's vehicle and requested Robinette's driver's license. Robinette supplied the deputy with his driver's license, and Newsome returned to his vehicle to check it. Finding no violations, Newsome returned to Robinette's vehicle. At that point, Newsome had no intention of issuing Robinette a speeding ticket. Still, Newsome asked Robinette to get out of his car and step to the rear of the vehicle. Robinette complied with Newsome's request and stood between his car and the deputy's cruiser. Newsome returned to his vehicle in order to activate the cruiser's video camera so that he could videotape his interaction with Robinette. Newsome returned to Robinette, issued a verbal warning regarding Robinette's speed, and returned Robinette's driver's license.

{¶ 3} After returning the license, Newsome said to Robinette, "One question before you get gone [*sic*]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" Newsome testified that as part of the drug interdiction project he routinely asked permission to search the cars he stopped for speeding violations. When Robinette said that he did not have any contraband in the car, Newsome asked if he could search the vehicle. Robinette testified that he was shocked at the question and "automatically" answered "yes" to the deputy's request. Robinette testified further that he did not believe that he was at liberty to refuse the deputy's request.

{¶ 4} Upon his search of Robinette's vehicle, Newsome found a small amount of marijuana. Newsome then put Robinette and his passenger in the back seat of the cruiser and continued the search. As a result of this extended search, Newsome found "some sort of pill" inside a film container. The pill was

determined to be methylenedioxy methamphetamine ("MDMA") and was the basis for Robinette's subsequent arrest and charge for a violation of R.C. 2925.11(A).

{¶ 5} Robinette's indictment was issued on December 18, 1992. On February 19, 1993, Robinette filed a motion to suppress the evidence found in the search of his vehicle. The trial court overruled the motion on March 8, 1993, finding that the deputy made clear to Robinette that the traffic matter was concluded before asking to search the vehicle. The court ruled that Robinette's consent did not result from any overbearing behavior on behalf of Newsome.

{¶ 6} Robinette appealed. The Court of Appeals for Montgomery County reversed the trial court, holding that Robinette remained detained when the deputy asked to search the car, and since the purpose of the traffic stop had been accomplished prior to that point, the continuing detention was unlawful and the ensuing consent was invalid.

{¶ 7} This matter is before this court upon an allowance of a discretionary appeal.

———————————

*Mathias H. Heck, Jr.*, Montgomery County Prosecuting Attorney; *Carley J. Ingram* and *Michael L. Gebhart*, Assistant Prosecuting Attorneys, for appellant. *James D. Ruppert*, for appellee.

*Betty D. Montgomery*, Attorney General, *Richard A. Cordray*, State Solicitor, and *Simon B. Karas*, Deputy Chief Counsel, urging reversal for *amicus curiae*, Ohio Attorney General.

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *William E. Breyer*, Assistant Prosecuting Attorney, urging reversal for *amicus curiae*, Ohio Prosecuting Attorneys Association.

———————————

**PFEIFER, J.**

{¶ 8} The issue in this case is whether the evidence used against Robinette was obtained through a valid search. We find that the search was invalid since it was the product of an unlawful seizure. We also use this case to establish a bright-line test, requiring police officers to inform motorists that their legal detention has concluded before the police officer may engage in any consensual interrogation.

{¶ 9} In order to justify any investigative stop, a police officer "must be able to point to specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio* (1968), 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906. Absent any additional articulable facts arising after the stop is made, the police officer must tailor his detention of the driver to the original purpose of the stop. *State v. Chatton* (1984), 11 Ohio St.3d 59, 63, 11 OBR 250, 253, 463 N.E.2d 1237, 1240.

{¶ 10} In *Chatton*, the police officer stopped the defendant's car when he noticed it had no license plates. When he approached the car after it had pulled over, the officer saw a valid temporary tag in the car's rear window. Despite the fact that the original question which gave rise to the stop had been resolved, the officer approached the driver and asked to see his driver's license. A check of the license revealed that it was suspended, and the officer ordered the defendant out of his vehicle and placed him under arrest for driving with a suspended license. Upon searching the vehicle, the officer discovered a loaded revolver under the driver's seat. The defendant was charged with carrying a concealed weapon.

{¶ 11} This court ruled in *Chatton* that the evidence resulting from the search should have been suppressed. This court reasoned that the officer, upon seeing the valid temporary tag, no longer maintained a reasonable suspicion that the defendant's vehicle was not properly licensed, and thus had no articulable reason to further detain the defendant to determine the validity of his driver's

license. As a result, any evidence seized upon a subsequent search of the vehicle was inadmissible under the Fourth Amendment to the United States Constitution.

{¶ 12} In this case, Newsome certainly had cause to pull over Robinette for speeding. The question is when the validity of that stop ceased. Newsome testified that from the outset he never intended to ticket Robinette for speeding. When Newsome returned to Robinette's car after checking Robinette's license, every aspect of the speeding violation had been investigated and resolved. All Newsome had to do was to issue his warning and return Robinette's driver's license.

{¶ 13} Instead, for no reason related to the speeding violation, and based on no articulable facts, Newsome extended his detention of Robinette by ordering him out of the vehicle. Newsome retained Robinette's driver's license and told Robinette to stand in front of the cruiser. Newsome then returned to the cruiser and activated the video camera in order to record his questioning of Robinette regarding whether he was carrying any contraband in the vehicle.

{¶ 14} When the motivation behind a police officer's continued detention of a person stopped for a traffic violation is not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure. *Chatton, supra*.

{¶ 15} The entire chain of events, starting when Newsome had Robinette exit the car and stand within the field of the video camera, was related to the questioning of Robinette about carrying contraband. Newsome asked Robinette to step out of his car for the sole purpose of conducting a line of questioning that was not related to the initial speeding stop and that was not based on any specific or articulable facts that would provide probable cause for the extension of the scope of the seizure of Robinette, his passenger and his car. Therefore the detention of Robinette ceased being legal when Newsome asked him to leave his vehicle.

**{¶ 16}** However, this case contains a feature not discussed in *Chatton*: Robinette consented to the search of his vehicle during the illegal seizure. Because Robinette's consent was obtained during an illegal detention, his consent is invalid unless the state proves that the consent was not the product of the illegal detention but the result of an independent act of free will. *Florida v. Royer* (1983), 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229, 238. The burden is on the state to prove that the consent to search was voluntarily given. *Id.* at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236. The factors used in consideration of whether the consent is sufficiently removed from the taint of the illegal seizure include the length of time between the illegal seizure and the subsequent search, the presence of intervening circumstances, and the purpose and flagrancy of the circumstances. *United States v. Richardson* (C.A.6, 1991), 949 F.2d 851, 858.

**{¶ 17}** In this case there was no time lapse between the illegal detention and the request to search, nor were there any circumstances that might have served to break or weaken the connection between one and the other. The sole purpose of the continued detention was to illegally broaden the scope of the original detention. Robinette's consent clearly was the result of his illegal detention, and was not the result of an act of will on his part. Given the circumstances, Robinette felt that he had no choice but to comply.

**{¶ 18}** This case demonstrates the need for this court to draw a bright line between the conclusion of a valid seizure and the beginning of a consensual exchange. A person has been seized for the purposes of the Fourth Amendment when a law enforcement officer, by means of physical force or show of authority, has in some way restrained his liberty such that a reasonable person would not feel free to walk away. *United States v. Mendenhall* (1980), 466 U.S. 544, 553-554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509.

**{¶ 19}** The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The

6

undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.

{¶ 20} The present case offers an example of the blurring between a legal detention and an attempt at consensual interaction. Even assuming that Newsome's detention of Robinette was legal through the time when Newsome handed back Robinette's driver's license, Newsome then said, "One question *before you get gone*: are you carrying any illegal contraband in your car?" (Emphasis added.) Newsome tells Robinette that before he leaves Newsome wants to know whether Robinette is carrying any contraband. Newsome does not ask if he may ask a question, he simply asks it, implying that Robinette must respond before he may leave. The interrogation then continues. Robinette is never told that he is free to go or that he may answer the question at his option.

{¶ 21} Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.

{¶ 22} We are aware that consensual encounters between police and citizens are an important, and constitutional, investigative tool. *Florida v. Bostick* (1991), 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389. However, citizens who have not been detained immediately prior to being encountered and questioned by police are more apt to realize that they need not respond to a police officer's questions. A "consensual encounter" immediately following a detention is likely to be imbued with the authoritative aura of the detention. Without a clear break from the detention, the succeeding encounter is not consensual at all.

{¶ 23} Therefore, we are convinced that the right, guaranteed by the federal and Ohio Constitutions, to be secure in one's person and property requires that

citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase "At this time you legally are free to go" or by words of similar import.

{¶ 24} While the legality of consensual encounters between police and citizens should be preserved, we do not believe that this legality should be used by police officers to turn a routine traffic stop into a fishing expedition for unrelated criminal activity. The Fourth Amendment to the federal Constitution and Section 14, Article I of the Ohio Constitution exist to protect citizens against such an unreasonable interference with their liberty.

{¶ 25} Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., WRIGHT and RESNICK, JJ., concur.

DOUGLAS, F.E. SWEENEY and COOK, JJ., dissent.

_____

**FRANCIS E. SWEENEY, SR., J., dissenting.**

{¶ 26} I am disturbed by the majority's requirement that police officers must now recite certain words before a consensual interrogation may begin. This "bright-line" test appears unique to Ohio and vastly undercuts our law enforcement's ability to ferret out crime. Furthermore, the majority's test is contrary to well-established state and federal constitutional law.

{¶ 27} The United States Supreme Court has made it clear that not every encounter between a police officer and citizen is a seizure. *Florida v. Bostick* (1991), 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389, 398. Instead, the encounter becomes a seizure and is subject to Fourth Amendment scrutiny only

when the encounter loses its consensual nature.[1]  *Id.*  Traditionally, the crucial test has always been "whether, taking into account all of the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"  *Id.* at 437, 111 S.Ct. at 2387, 115 L.Ed.2d at 400.  In other words, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  *United States v. Mendenhall* (1980), 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509.  See, also, *State v. Childress* (1983), 4 Ohio St.3d 217, 4 OBR 534, 448 N.E.2d 155.  The determination of whether consent has been freely given has always been a factual one, which, once made, should not be disturbed on appeal.  *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-2048, 36 L.Ed.2d 854, 862-863.

**{¶ 28}** The United States Supreme Court has consistently applied this legal standard in cases dealing with consensual encounters.  In fact, in *Bostick, supra*, the Supreme Court struck down a *per se* rule adopted by the Florida Supreme Court that all routine bus searches were unconstitutional.  The Supreme Court remanded the case to the state court to apply the totality-of-the-circumstances test.  More to the point of the facts of this case, in *Florida v. Jimeno* (1991), 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297, the court applied this legal standard to justify a consent to search following a traffic stop.

**{¶ 29}** Indeed, courts from around the nation have had no problem in upholding the validity of consensual searches where consent was obtained after a traffic stop.  See*, e.g., State v. C.S.* (Fla.App.1994), 632 So.2d 675; *State v. Bonham*

---

1.  Section 14, Article I of the Ohio Constitution is analogous to the Fourth Amendment to the United States Constitution.

(1993), 120 Ore.App. 371, 852 P.2d 905; *United States v. Werking* (C.A. 10, 1990), 915 F.2d 1404.

{¶ 30} Despite this well-established test, the majority now holds that before a police officer may engage in consensual interrogation, the officer must inform the individual that "at this time you legally are free to go." However, the United States Supreme Court has ruled that being informed of the right to refuse a search is but one factor to be taken into account when determining whether consent was freely given; it is not the "*sine qua non* of an effective consent." *Schneckloth, supra*, 412 U.S. at 227, 93 S.Ct. at 2048, 36 L.Ed.2d at 863. The distinction between being informed of the right to refuse a search and being informaed of the right to leave the scene is insignificant. Whether the police officer uttered a warning is a relevant consideration, but it does not end the inquiry.

{¶ 31} I would instead apply the totality-of-the-circumstances test to this case. Here, appellee was properly stopped and detained for speeding. After the traffic matter was concluded, the officer returned appellee's license. Appellee testified that he believed he was free to leave. At this point, the encounter between appellee and the police officer became an ordinary consensual encounter between a private citizen and a law enforcement officer. Since appellee's liberties were not curtailed and since he understood that he could leave, there was no "seizure" implicating state or federal constitutional guarantees. Appellee's consent should not be invalidated solely because it followed a traffic stop and simply because the police officer failed to warn appellee that he was free to go. The utterance of these "magic words" is but one factor for the fact-finder to consider when making the determination as to whether consent was voluntarily given.

{¶ 32} In *Mendenhall, supra*, at 554, 100 S.Ct. at 1877, 64 L.Ed.2d at 509, the United States Supreme Court lists other examples of circumstances that might indicate a seizure and, consequently, invalid consent: the threatening presence of several officers, display of a weapon, physical touching of the person, and the use

of language or tone of voice indicating that compliance with the officer's request is compelled. None of these factors was present in this case. Appellee testified that the officer was nice to him at all times and never drew a weapon. Although appellee may have been intimidated or nervous, the officer's conduct did not rise to such a level as to make him believe he had to agree to the search.

**{¶ 33}** As support for its holding, the majority relies on *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237. However, *Chatton* is clearly distinguishable from this case. In *Chatton*, the police officer stopped the defendant for driving without license plates. Once the officer discovered that the vehicle displayed a temporary tag, which made his initial stop improper, the officer nevertheless detained the defendant and asked to see his license. The issue in *Chatton* was whether the police officer had continuing justification to detain the defendant. In this case, the issue is whether an individual who has been validly detained pursuant to a traffic stop may, in response to a police request, give a free and voluntary consent to search, once the traffic stop has been completed and the individual knows he is free to leave. Even the majority concedes that consent was not an issue in *Chatton*. However, the instant case turns entirely on the issue of consent. Thus, *Chatton* has little applicability to this case.

**{¶ 34}** This technique of requesting consent following an initial valid detention is employed on a daily basis throughout this nation to interdict the flow of drugs. While I certainly do not advocate giving police officers carte blanche in their treatment of traffic violators, when the original stop is permissible, the police should be permitted to make inquiries that are not coercive. The majority's bright-line test undercuts police authority and severely curtails an important law enforcement tool that is sanctioned by state and federal constitutional law.

**{¶ 35}** For all these reasons, I would reverse the court of appeals and reinstate the trial court's judgment.

DOUGLAS and COOK, JJ., concur in the foregoing dissenting opinion.

_____