UNITED STATES of America

v.

**Robert H. SULLIVAN, Defendant.**

**Criminal Action No. 96–339–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Nov. 19, 1996.

---

Mark S. Determan, U.S. Attorney's Office, Alexandria, VA, for United States.

David B. Smith, English & Smith, Alexandria, VA, for defendant.

## ORDER AND OPINION

DOUMAR, District Judge.

This matter is before the Court on defendant's motion to suppress his confession to a police officer that a firearm was in his vehicle and also to suppress the firearm and ammunition themselves. For the reasons expressed below, the motion is hereby **GRANTED.**

### I. Factual Background

In his motion, the defendant made a series of factual allegations regarding the circumstances surrounding the traffic stop during which the firearm and ammunition were discovered in his vehicle. At the oral hearing, the Court made a series of factual findings and reserved a single, discrete legal question for consideration. Thus, the facts presented below reflect the Court's factual findings. The defendant's contrary allegations are noted where appropriate.

On January 23, 1996, at noontime, the defendant was stopped by Park Police Officer Ferstl while the defendant was driving on the George Washington Parkway, because the officer observed that defendant was driving without a front tag. After the defendant pulled over to the side of the highway and the officer approached the defendant's vehicle, the officer observed that the front tag was in fact displayed on the dashboard. During a brief conversation between the defendant and the officer, the defendant informed the officer that he had an unpaid traffic ticket. Because of computer difficulties, the officer called the Metropolitan Airport Police for assistance in running a computer check on both the defendant's driver's license and the unpaid ticket. Between five and ten minutes later, Metropolitan Airport Police Officer Evans arrived. The computer check took 5 minutes to complete. Officer Evans left. Officer Ferstl then returned to the defendant's car, returned the driver's license to him, and advised him to take care of the ticket and the tag.

Everyone agrees that Officer Ferstl then began to question the defendant regarding any contraband the defendant may have had in the vehicle, a matter wholly unrelated to the reasons for the traffic stop. The parties greatly differ, however, on the precise nature and circumstances of the interrogation. The defendant alleges first that Officer Ferstl did not return his driver's license to him before beginning the interrogation. He alleges a second police officer—presumably Officer Evans—remained present during the entire encounter, that Officer Ferstl said he would "burn" the defendant if he had contraband in the vehicle but did not admit it, and that both officers had his hand on the pistol grip of his weapon while Officer Ferstl interrogated the defendant.

Having listened to both the defendant's testimony and the officers' testimony, this Court rejects all of these allegations. Instead, as the Court stated at the conclusion of the oral hearing, the only matter under consideration is whether Officer Ferstl's repeated questioning regarding matters outside the scope of the circumstances leading to the traffic stop amounted to custodial interrogation. In addition, the Court finds that Officer Ferstl did return the defendant's driver's license to him before questioning him. Thus, the factual background continued below reflects the facts exactly as this Court found them.

After Officer Evans left and the computer check was done, Officer Ferstl returned the defendant's driver's license to the defendant and warned the defendant to remedy both the misplaced front tag and the unpaid traffic ticket. Officer Ferstl then began to interrogate the defendant regarding the possible presence of contraband in his vehicle, Officer Ferstl testified, because the defendant "appeared nervous." The officer asked the defendant if he had anything illegal in the vehicle. The defendant replied "illegal!" but said nothing else. The officer repeated the question, but the defendant remained silent. The officer repeated the question a third time, but defendant again did not reply. The officer then told the defendant that if he had anything illegal in the vehicle, it would be

better to tell the officer immediately. Defendant still remained silent. The officer persisted, and he asked "what do you have in the vehicle?" For a fifth time, the defendant still would not respond. The officer then told the defendant that if Sullivan confessed, the officer "would be cool with him." Finally, after the officer's sixth effort, the defendant answered, "I have a gun."

After this confession, the officer handcuffed the defendant, searched the defendant's vehicle, and found a Browning nine-millimeter pistol loaded with fourteen rounds of ammunition under the driver's seat. Subsequently, the defendant was indicted for unlawfully possessing a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), because the defendant had previously been convicted in Maryland state court in 1985 of a crime punishable by imprisonment for a term exceeding one year. The defendant had been convicted, incidentally, of robbery with a deadly weapon.

Everyone agrees that at no time during the interrogation did Officer Ferstl inform the defendant of his *Miranda* rights. Thus, the only question remaining for the Court to decide is this: whether the manner and circumstances surrounding Officer Ferstl's repeated questioning of the defendant was a "consensual interrogation" or a "custodial interrogation." If the former, then the officer had no duty inform the defendant of his *Miranda* rights. If the latter, then the officer was bound by law to inform the defendant of his *Miranda* rights, and the failure to do so would require this Court to suppress both the confession and the fruits of that confession.

## II. An Analysis of the Relevant Legal Principles

Pursuant to the Fifth Amendment, *Miranda* warnings must be provided to suspects held "in custody" before law enforcement officers may interrogate the suspect in a manner likely to result in incriminating answers. A significant body of occasionally conflicting precedent defining "in custody" has developed in the past two decades. The Fourth Amendment has spawned a separate body of precedent defining when a suspect is "seized" for purposes of defining the consti-

tutional limits of so-called *Terry* stops. Because of the apparent similarity between the two concepts, courts occasionally merge the two bodies of law, and the Supreme Court has yet to define precisely the relationship between them. Therefore, while the case before this Court appears to present solely a Fifth Amendment question, the Court reviews in some detail both bodies of law.

### A. The Fifth Amendment

The Fifth Amendment to the United States Constitution provides: "No person ... shall be compelled in any criminal case to be a witness against himself...." Pursuant to the Fifth Amendment, in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court commanded law enforcement officers to inform potential defendants that they have certain rights prior to beginning any "custodial interrogation." *Id.* at 444, 86 S.Ct. at 1612. Specifically, before any "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way," the defendant must be informed about his right to remain silent, that statements he does make may be used against him, and that he has a right to the presence of a retained or appointed attorney. *Id.* To insure compliance with its mandate, the Supreme Court further commanded that statements stemming from the custodial interrogation of a defendant may not be introduced into evidence to establish the defendant's guilt, unless the defendant was informed of these now familiar *Miranda* rights prior to the custodial interrogation.

Eighteen years later, in *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court discussed the applicability of *Miranda* to the roadside questioning of a motorist detained pursuant to an ordinary traffic stop, which the Court deemed analogous to a so-called *Terry* stop. In *Berkemer*, the Court acknowledged that a traffic stop significantly curtails the freedom of action of the driver. In doing so, the Court explained, "under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car

or, once having stopped, to drive away without permission. Certainly few motorists would feel free ... to leave the scene of a traffic stop without being told they might do so." *Id.* at 436, 104 S.Ct. at 3148 (citation and footnote omitted).

Nevertheless, the Court refused to create an inflexible rule that motorists detained pursuant to routine traffic stops constitutes "custodial interrogation," to which *Miranda* rights apply. In doing so, the Court noted that the detention of a motorist pursuant to a simple traffic stop is ordinarily brief and in the presence of other passing motorists. This, the Court explained, mitigated the danger that an interrogating officer would induce the motorist to speak when the motorist would otherwise not do so freely. *Id.* at 437–38, 104 S.Ct. at 3149.

The Court cautioned law enforcement officers, however, that a motorist detained pursuant to a traffic stop who is thereafter "subjected to treatment that renders him 'in custody' for practical purposes ... will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440, 104 S.Ct. at 3150. The Court freely admitted,

> our adherence to the doctrine just recounted will mean that the police and lower courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody. Either a rule that *Miranda* applies to all traffic stops or a rule that a suspect need not be advised of his rights until he is formally placed under arrest would provide a clearer, more easily administered line. However, each of these two alternatives has drawbacks that make it unacceptable.

*Id.* at 441, 104 S.Ct. at 3151.

Instead, the Court explained that "the only relevant inquiry" in determining whether a detained motorist was in custody was how a reasonable person in the suspect's position would have understood his situation. *Id.* at 442, 104 S.Ct. at 3151; *see also Davis v. Allsbrooks,* 778 F.2d 168, 171 (4th Cir.1985).

### B. The Fourth Amendment

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the case namesake for *Terry* stops, the Supreme Court held that "[i]t is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime—"arrests" in traditional terminology." *Id.* at 16, 88 S.Ct. at 1877. The Court instructed lower courts to analyze the constitutionality of these so-called "investigative detentions" with a dual inquiry: "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879. Thus, *Terry* set forth two important propositions: first, a seizure need not be a formal arrest in order to subject it to the requirements of the Fourth Amendment, and second, such a seizure, because it is limited in intrusiveness, may be reasonable under the Fourth Amendment even in the absence of the traditional probable cause requirement necessary for formal arrest. *See* LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 5.1(a) (1996). In other words, *Terry* holds that the Fourth Amendment permits police officers to use limited force to "seize" a person when the officers have "reasonable suspicion," a lesser quantum of suspicion than "probable cause" that criminal activity is afoot. At some point, however, the amount of intrusiveness used in the "seizure" of a person transforms a *Terry* stop into a formal arrest, for which probable cause is required. *See United States v. Brignoni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975).

■ Thus, a person is seized within the meaning of the Fourth Amendment whenever physical force is applied or whenever there is a show of official authority such that a reasonable person would have believed that he was not free to terminate the encounter *and* the person submits to the show of authority. *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *United States v. Wilson,* 953 F.2d 116 (4th

Cir.1991). An objective test determines whether a reasonable person would have believed himself free to terminate the encounter. *United States v. Gordon*, 895 F.2d 932 (4th Cir.), *cert. denied*, 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 98 (1990).

Notably, because an ordinary traffic stop is very similar to the brief stops described in *Terry* and its progeny, the Fourth Circuit routinely applies the *Terry* analysis "to determine the limits of police conduct in routine traffic stops." *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir.), *cert. denied*, 506 U.S. 926, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992). Thus, pursuant to *Terry*, "[i]f the initial traffic stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the 'fruit of the poisonous tree doctrine.'" *Id.* (citation omitted).

## C. The Interplay Between the Fourth and Fifth Amendments

Although the general legal principles appear quite clear to this Court, as the Supreme Court itself predicted in *Berkemer*, the application of these general principles has bedeviled courts wishing to strike a balance between permitting the use of undeniably effective investigatory tools and the formal Fifth Amendment doctrine created in *Miranda*. Worse, courts have struggled with the precise relationship to which *Berkemer* alluded but did not define between Fourth Amendment jurisprudence embodied in *Terry* and its progeny and the Fifth Amendment jurisprudence embodied in *Miranda* and its progeny. Courts occasionally use Fourth Amendment precedent for Fifth Amendment propositions, and vice-versa. The analytic and practical difficulties of this practice have been well-documented in the scholarly literature. *See, e.g.*, Mark A. Godsey, *When Terry Met Miranda: Two Constitutional Doctrines Collide*, 63 Ford.L.Rev. 715 (1994); Note, *Custodial Engineering: Cleaning Up the Scope of Miranda Custody During Coercive Terry Stops*, 108 Harv. L.Rev. 665 (1995). Therefore, although the instant case before this Court appears to be a Fifth Amendment case, a short discussion of courts' recent forays into the confusing realm of Fourth and Fifth Amendment intersection follows.

### 1. The Ohio Case

In *State of Ohio v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695 (1995), the Ohio Supreme Court established a bright line rule that police officers must inform motorists detained for traffic violations when their legal detention has concluded and that they are free to leave before beginning interrogation; otherwise, that interrogation will not be deemed "consensual." In that case, the Ohio Supreme Court explained that the defendant had been stopped for speeding. The officer obtained the defendant's driver's license, checked it for violations and found none. Nevertheless, the officer asked the defendant to step out of the vehicle, at which time the officer activated his cruiser's video camera to record his interaction with the defendant. The officer then issued a verbal warning regarding the defendant's speeding and then returned the defendant's driver's license. After returning the license, however, the officer asked the defendant, "One question before you get gone [sic]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" The defendant replied that he did not, and the officer then asked if he could search the vehicle. The defendant agreed, and the officer discovered a small amount of marijuana and a single pill of methylenedioxy methamphetamine in the ensuing search. In the eventual prosecution of the defendant, the defendant moved to suppress the evidence found in the search of his car.

In affirming a lower court's grant of the defendant's motion, the Ohio Supreme Court commented that "when the motivation behind a police officer's continued detention of a person stopped for a traffic violation is not related to the purpose of the original, constitutional stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some separate illegal activity justifying an extension of the detention, the continued detention constitutes an illegal seizure." *Id.* 653 N.E.2d at 697–98. The court further stated that a person has been "seized" for purposes of the Fourth Amendment to the United States Constitu-

tion when a law enforcement officer, by means of force or apparent authority, has restrained his liberty such that a reasonable person would not feel free to walk away. *Id.* at 698. The court concluded,

> The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.
>
> . . . .
>
> Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person would not feel free to walk away as the officer continues to address him.
>
> . . . .
>
> Therefore, we are convinced that the right guaranteed [by the Fourth Amendment to the United States Constitution and also the Ohio Constitution] to be secure in one's person and property requires that citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation.

*Id.* at 698–99.

As a result, the court granted the defendant's motion to suppress. Thus, while this case appeared to be strictly a Fourth Amendment case, the Ohio Supreme Court used Fifth Amendment "custodial interrogation" versus "consensual interrogation" principles to arrive at a Fourth Amendment rule of law.

Reactions to the *Robinette* decision had been mixed. On the one hand, because the United States Court of Appeals for the Sixth Circuit agreed that once the reason initially justifying a traffic stop had been satisfied, police officers must release the defendant if they have no basis for an unrelated inquiry,

the Sixth Circuit stated that it "interestingly" came to the same conclusion as that in *Robinette.* *See United States v. Erwin,* 71 F.3d 218, 222 (6th Cir.1995) *reh'g en banc granted, opinion vacated by circuit rule,* 78 F.3d 232 (1996). Yet, the Sixth Circuit explained that it "does not choose to go as far as the Ohio Supreme Court did in [creating a bright-line test] *Robinette,*" because they did not believe the Fourth Amendment required it. *Id.* On the other hand, an intermediate appellate court in Missouri refused to adopt *Robinette* and called that case "a relatively isolated attempt to impose a 'litmus paper' test on an area of the law which is not amenable to one. . . . We refuse to interpret the Fourth Amendment as mandating an arbitrary point after which further questioning is not allowed." *State v. Scott,* 926 S.W.2d 864, 870 (Mo.Ct.App.1996).

Finally, just yesterday, on November 18, 1996, the United States Supreme Court reversed the Ohio Supreme Court's ruling in *Robinette.* *See Ohio v. Robinette,* —— U.S. ——, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Reminding lower courts that reasonableness is the touchstone of Fourth Amendment analysis, the Court again "eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Id.* In doing so, the Court held that the Fourth Amendment test for the voluntariness of a search is a question of fact to be determined from all relevant circumstances, and therefore is not amenable to bright-line tests. *Id.* The Court then remanded the case to the Ohio Supreme Court for proceedings not inconsistent with the Court's judgment.

Justice Stevens's dissenting opinion underscores the Court's limited ruling in *Robinette.* Justice Stevens wrote, "[t]he Court's holding today is narrow: The Federal Constitution does not require that a lawfully seized person be advised that he is "free to go" before his consent to search will be recognized as voluntary. I agree with that holding." *Id.* (Stevens, J., dissenting). This Court concurs with Justice Stevens's characterization of the Supreme Court's holding: In overruling the Ohio Supreme Court's ruling, the Supreme Court held only that a bright-line rule is not required by the United

States Constitution. Indeed, Justice Stevens explicitly agreed with the Court's holding. He dissented merely because he felt that the Ohio Supreme Court's bright line rule was not actually relied upon in the *Robinette* case, and that the Ohio Supreme Court correctly determined—without reliance upon the bright-line rule the court contemporaneously announced—that the search was involuntary. Instead, Justice Stevens felt that the Ohio Supreme Court simply announced the bright-line rule as a future guide to Ohio law enforcement officers. *Id.* He wrote, "[a]ccordingly, while I have concluded that the judgment of the Supreme Court of Ohio should be affirmed, and thus dissent from this Court's disposition of the case, I am in full accord with [the majority's] conclusion that the Federal Constitution neither mandates nor prohibits the warnings prescribed by the Ohio Court." *Id.*

Therefore, as the Court's opinion indicates and Justice Stevens emphasized, the Court in *Robinette* crafted one, narrow rule of law: the United States Constitution does not require that a police officer who has detained a motorist pursuant to an ordinary traffic stop must inform the motorist when he is free to leave. In other words, as a matter of Fourth Amendment law, consent to an officer's search request can be given voluntarily by the motorist, despite the officer's failure to inform the motorist that he is no longer being detained pursuant to the traffic violation. Thus, the Court's opinion merely corrects a misreading of Fourth Amendment doctrine governing the voluntariness of consensual searches. Importantly, the Supreme Court's opinion does not clarify or alter the law indicating when a person is "in custody" for purposes of *Miranda*.

### 2. Other Cases

Two Fourth Circuit opinions indirectly address concepts of official custody in relation to the odd intersection between the Fourth Amendment and *Miranda* and the Fifth Amendment. First, in *Davis v. Allsbrooks*, 778 F.2d 168 (4th Cir.1985), the Fourth Circuit reasoned from a *Miranda* perspective, "[t]hough informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody [for purposes of

*Miranda* ], it is not a talismanic factor. Where, as here, the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive." *Id.* at 171–72. This *Miranda*-based reasoning resonates in the Supreme Court's Fourth Amendment-based ruling in *Robinette* yesterday.

Much more recently, in a traffic stop case decided by reference to the Fourth Amendment, the Fourth Circuit has found that a motorist would feel free to leave once the police officer returned his driver's license. *See United States v. Lattimore*, 87 F.3d 647 (4th Cir.1996). In *Lattimore*, a motorist was stopped for speeding. The motorist accompanied the officer to his cruiser while the officer prepared a warning citation for the speeding and a citation for failure to wear a seat belt. After issuing the citations and returning the motorist's driver's license, as the motorist prepared to exit the cruiser, the officer asked the motorist if there were any contraband in his vehicle. After the motorist answered no, the officer then requested and received permission to search the vehicle. After an extended conversation, the motorist signed a written consent form, which, as the officer explained to the motorist, stated that the officer in no way forced, threatened, or compelled the motorist to consent to the search. *Id.* at 649. After the written consent was signed, the officer searched the motorist's vehicle, in which the officer found crack cocaine and drug paraphernalia. The motorist subsequently made two arguments to suppress the evidence seized during the search. His main contention was that his consent to the search was involuntarily given. His alternative contention, however, was that the officer "exceeded the permissible scope of the traffic stop and that this illegal detention vitiated his consent to the search." *Id.* at 650.

After briefly reviewing the law regarding voluntary consent as an exception to the Fourth Amendment's prohibition against unreasonable searches, the court in *Lattimore* concluded that the factual circumstances supported the district court's finding that the motorist's oral and written consent to the search was voluntary. *Id.* at 651–52. The court then turned to the alternative assertion

that "by questioning him concerning the presence of narcotics in the automobile without possessing a reasonable suspicion that he was engaged in criminal activity, Trooper Frock exceeded the lawful scope of the traffic stop and thereby converted the encounter into an illegal detention that tainted the subsequent search." *Id.* at 652. The court rejected this assertion and wrote,

> Trooper Frock did not question Lattimore concerning the presence of narcotics or contraband in his automobile, or request permission to search it, until after the officer had issued the citations and returned Lattimore's driver's license, indicating that all business with Lattimore was completed and that he was free to leave. During the subsequent conversation between Trooper Frock and Lattimore, 'a reasonable person would have felt free to decline the officer['s] requests or otherwise terminate the encounter.' The totality of the circumstances presented indicate that from this point forward the encounter was consensual; Lattimore was not being detained. Thus, there was no illegality to taint Lattimore's oral consent to the search.

*Id.* at 653 (citation omitted).

Perhaps the most clear depiction of the confusion between the developing Fourth and Fifth Amendment jurisprudence came in *United States v. Perdue*, 8 F.3d 1455 (10th Cir.1993). In *Perdue*, the Tenth Circuit held that a defendant's incriminating statements were obtained by interrogation conducted without the required *Miranda* warnings. *Miranda* warnings were required by the Tenth Circuit, even though the interrogation occurred during a valid *Terry* stop. *Id.* at 1467. The district court had concluded that since the defendant was interrogated during a valid *Terry* stop, the answers to those questions were voluntary and thus *Miranda* warnings were not necessary. The Tenth Circuit reversed:

> In relying on Fourth Amendment doctrine to determine whether Mr. Perdue's confession was voluntary and whether he should have been advised of his *Miranda* rights, the district court merged several distinct constitutional inquiries into one. The Dis-

trict court's confusion is understandable because this case presents unique questions concerning the subtle interplay between *Terry, Miranda,* and due process. *Id.* At 1461. Although conceding that the "traditional view" is that *Miranda*'s Fifth Amendment concerns are "simply not implicated in the context of a valid *Terry* stop," the court observed that "[o]ne cannot ignore the conclusion, however, that by employing an amount of force that reached the boundary line between a permissible *Terry* stop and an unconstitutional arrest, the officers created the 'custodial' situation envisioned by *Miranda.*" *Id.* At 1464. Thus, because the permissible scope of a *Terry* stop has been expanded so that the concepts of "in custody" Fifth Amendment doctrine and "under arrest" Fourth Amendment doctrine are no longer equivalent in meaning, the Tenth Circuit believed that a court should not look to solely Fourth Amendment jurisprudence to determine whether *Miranda* and the Fifth Amendment has been implicated.

Of course, the Tenth Circuit's analysis presents a difficulty to police officers looking for clear rules to follow. Not only must officers struggle with what "reasonable suspicion" is in order to make a valid *Terry* stop and what "probable cause" is in order to make a valid, formal arrest, they must also determine whether or not the *Terry* stop places the suspect "in custody." Under the Tenth Circuit's analysis, whether or not a detention considered a *Terry* stop for Fourth Amendment purposes places the suspect "in custody" for Fifth Amendment purposes necessarily controls whether the officer must inform the suspect of his *Miranda* rights.

Nevertheless, at least one other Circuit—the Seventh Circuit—agrees that "a Fifth and Sixth Amendment *Miranda* analysis requires a different focus than that for a Fourth Amendment *Terry* stop." *United States v. Smith,* 3 F.3d 1088, 1096 (7th Cir. 1993), *cert. denied,* 510 U.S. 1061, 114 S.Ct. 733, 126 L.Ed.2d 696 (1994). Because that court felt that the purposes of the *Miranda* rule differ completely from underpinnings of *Terry,* "a completely different analysis of the circumstances is required. The inquiry is much narrower. The number of relevant

facts is severely limited. Police officers have much less discretion [before *Miranda* is triggered] than in Fourth Amendment cases." *Id.* at 1097.

### III. Application

An understandable, legal confluence emerges in the midst of these swirling currents and countercurrents of constitutional doctrine. In short, there exists categories of gradually more resolute detentions. Courts should determine whether a particular detention renders a suspect "in custody," or holds the suspect pursuant to a *"Terry* stop," or places the suspect under formal arrest, by referring to a vaguely defined continuum of gradually more intrusive, authoritative, or forceful acts by the law enforcement officer conducting the detention.

In this case, the defendant's fundamental argument is that this Court should suppress his incriminating confession and the subsequent fruits of that confession, because Officer Ferstl did not inform the defendant of his *Miranda* rights prior to or during the interrogation precipitating the confession. The government's central reply is that the defendant was not "in custody" during the interrogation, which would render *Miranda* inapplicable. The question presented clearly requires this Court to interpret *Miranda* and its progeny. Thus, the Court need only apply the standard set forth by the Supreme Court in *Berkemer*: would an objectively reasonable person in the defendant's place have understood that he was free to leave? If so, then *Miranda* is inapplicable, and the challenged evidence will not be suppressed. If an objectively reasonable person would *not* have felt free to leave, however, *Miranda* and its progeny necessitates the suppression of the evidence.

As both the United States Supreme Court and the Ohio Supreme Court have observed, few motorists pulled over for a traffic violation feel at liberty to leave until the police officer explicitly gives them permission to do so. *See Berkemer,* 468 U.S. at 436, 104 S.Ct. at 3148; *Robinette,* 653 N.E.2d at 698–99. On the other hand, the Fourth Circuit has held that once the motorist's driver's license has been returned to him, a reasonable person would feel free to ignore the officer's single question regarding the existence of contraband in the vehicle, even when that question was paired with a request to search the car. *See Lattimore,* 87 F.3d at 653. The United States Supreme Court's opinion overruling the Ohio Supreme Court's ruling in *Robinette* has no bearing on this issue.

In this case, this Court has found that Officer Ferstl did return the driver's license to the defendant after issuing the verbal warning but before interrogating him. This signaled the conclusion of the officer's investigation of the circumstances justifying the initial traffic stop—the missing front tag. As a matter of law, because Officer Ferstl lacked reasonable suspicion that some other illegal conduct was afoot,[1] Officer Ferstl could not detain the defendant further without the defendant's consent. Nevertheless, Officer Ferstl decided to fish for information; he immediately began to ask the same question of the defendant not once but six times—essentially, did the defendant have anything illegal in the car? The defendant's silence did not deter Officer Ferstl; indeed, he admonished the defendant that his position would be improved if he admitted that he had contraband in his vehicle. Thus, immediately after the conclusion of a somewhat prolonged traffic stop, Officer Ferstl subjected the defendant to six repeated, insistent questions obviously designed to invite incrimination.

These six repeated, insistent questions distinguishes this case from the single question asked in *Lattimore.* Although precise lines cannot be drawn—indeed, if the Supreme Court's opinion in *Robinette* has any bearing on this case, it is that precise lines *should not* be drawn in fact-specific, constitutional inquiries—this Court simply believes that this was at least one question too many. Under current law, the Court cannot avoid the conclusion that an objectively reasonable person in the defendant's place would not have felt that he could leave prior to the sixth question.

---

1. Although the officer testified that the defendant appeared nervous when the officer questioned him, the government does not attempt to argue that this constituted reasonable suspicion. Thus, government's sole argument has been that the interrogation was consensual, not custodial.

Therefore, for purposes of *Miranda,* the defendant was "in custody." As such, the confession and the fruits of the confession obtained during that "custodial interrogation" must be suppressed.

A further comment seems appropriate here, however. This Court remains bound by current law, and thus the Court feels obliged to suppress the evidence. Simply because this conclusion is legally correct, however, certainly does not mean that it is desirable. In this case, no one questions that the defendant is factually guilty of the charges against him. With ridiculous regularity, however, the criminal justice system considers factual guilt irrelevant. Instead, under the false guise of protecting an accused's civil liberties, our criminal justice system now focuses almost entirely upon exacting, technical compliance with procedural rules inapposite to factual truth. Thus, an observation: Innocent people have no need to suppress evidence, only the guilty do.

Initially, courts excluded evidence obtained through government overreaching, because no other method of curtailing the abuse existed. Clearly, that is no longer the case. Police and governmental officers are constantly subjected to civil suits, which today provide substantial remedy for governmental abuse. These lawsuits were unavailable when exclusionary rules were first adopted. Now, in the Eastern District of Virginia, Section 1983 lawsuits against those acting under color of law, such as police, corrections, and probation officers, constitute almost forty·percent of the civil docket. In almost all of these cases, the defendant argues not that he is factually innocent, but that those acting under color of law have abused their power. Our system increasingly concerns itself with form over substance. This development cannot long be tolerated by a public fearful of an ineffective justice system. I urge our Supreme Court to remedy these troubling developments, because the reason for the expansive use of the exclusionary rule no longer exists.

### IV. Conclusion

For the reasons stated above, the Court hereby **GRANTS** the defendant's motion. The Court **ORDERS** that the defendant's confession, the firearm, and the ammunition, be and is hereby **SUPPRESSED.**

The Clerk is directed to send copies of this Order and Opinion to counsel for the defendant and counsel for the government.

**It is so ordered.**