

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00039-CR

FELISHA DIANE WILLIAMS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 18,229

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

Felisha Diane Williams appeals her conviction for possession of a controlled substance with intent to deliver,[1] resulting from a traffic stop by Gilmer Police Officer Aaron Morris. After the trial court denied Williams's motion to suppress evidence, she pled guilty. A jury was empaneled to determine punishment and assessed a sentence of ninety-nine years' imprisonment. On appeal, Williams challenges the trial court's denial of the suppression motion, complains that the State impermissibly argued parole law to the jury, and asks that the judgment be reformed to reflect her pleas of guilty to the indictment and true to the enhancement allegation. We modify the trial court's judgment to properly reflect the pleas and affirm the judgment and sentence, as modified, because (1) Morris did not impermissibly extend the traffic stop and (2) Williams failed to preserve complaints regarding parole law references, but (3) the judgment should be modified to correctly show Williams's pleas.

The events leading to Williams's arrest and conviction occurred May 26, 2018. However, eight days earlier, another traffic stop, not involving Williams but involving the same vehicle and the same front-seat occupants, had been conducted by Gilmer Police Sergeant Dube.[2] Morris, the officer on the May 26 stop that led to Williams's arrest, assisted Dube on the May 18 stop. On the earlier occasion, Dube had pulled over the same vehicle occupied by the same driver and the same female front-seat passenger as in the May 26 stop. In the earlier encounter, the front-seat passenger gave the officers a name and birthdate that later were

---

[1]*See* TEX. HEALTH & SAFETY CODE ANN. § 481.112.

[2]Sergeant Dube's first name is not revealed in the record.

2

determined to be likely false,[3] but the officers did not discover that problem until after that traffic stop had been completed and the passenger had departed the scene.[4]

On May 26, 2018, Williams was the backseat passenger in the same car as it travelled south in Gilmer. Morris[5] was northbound when he saw the southbound vehicle. When the vehicle passed his police car, Morris saw the vehicle turn into a parking lot, then immediately leave the lot and continue southbound. That made Morris suspicious, and he turned to follow. He saw that the back of the car bore a temporary, paper license tag, whereas he had noticed that the front of the vehicle bore a metal license plate. Suspecting a violation of the Texas Transportation Code,[6] Morris initiated a traffic stop. He agreed with Williams's question at the suppression hearing that Morris's only reason for the initial stop was the inconsistent license tags.

---

[3]The name given by the passenger came back to a female who was five feet, five inches tall and weighed 250 pounds. The officers did not believe the passenger weighed that much.

[4]In the earlier stop, the driver, a Ms. Hicks, was arrested on an outstanding warrant. The passenger gave the officers the name of Nancy Tunnell. Dube escorted Hicks to the Gilmer jail. Morris tried to help "Tunnell" start the car; he left "Tunnell" at the scene to retrieve a jump box to service the car. When Morris returned to the scene, the car and "Tunnell" were gone. Later, Dube and Morris found that the physical description of Tunnell was five feet, five inches tall, and a weight of 250 pounds. Those attributes did not correspond with the now-gone passenger. In that post-encounter conversation, Morris said he and Dube "agreed that there was something off about her--about her name, that she seemed real calm, gave it like any normal person would, but something seemed off about it." After the stop and "Tunnell" left in the car, the officers received information on the weight of a woman named "Tunnell" where "the weight was higher than what [the woman giving the name of "Tunnell"] appeared to be."

[5]At the time of trial, Morris was no longer with law enforcement; he worked at the Walmart Distribution Center in Palestine. At the time of the incident leading to Williams's conviction and this appeal, he had only been a police officer for one year. At the suppression hearing, Morris told defense counsel that, at the time of the arrests described below, his report-writing skills were under development. He stated, "I have never been good at writing ever. At that time, I hadn't been a police officer very long. And at that time, my report-writing skills were still in development and obviously needed more work."

[6]For example, the driver could have violated Sections 502.472 and 502.475 of the Texas Transportation Code. TEX. TRANSP. CODE ANN. § 502.472 (operation of vehicle under improper registration), § 502.475 (Supp.) (wrong, fictitious, altered or obscured insignia).

3

When Morris encountered the driver, however, he recognized her and the front-seat passenger, as well as the car, from the May 18 stop. Based on his earlier encounter with car, driver, and front-seat passenger, Morris's suspicions on May 26 were further aroused.

As was his practice, Morris set out to identify all people in the car. Morris agreed with defense counsel's question that the front-seat passenger gave a name, Morris went to his police car and gave that name to the dispatcher to check, and then Morris returned to the car to ask the front-seat passenger her name again. Defense counsel asked, "And ten minutes into the traffic stop, after all this investigation of why you pulled them over was over with, you contacted dispatch and you ask for a physical description of the name she gave you; is that correct?" Morris agreed.

Once officers isolated the apparent mismatch in physical traits of the passenger and the real Nancy Tunnell, Dube went to the police department, obtained a photograph of the real Nancy Tunnell, and radioed Morris that the front-seat passenger was not the person she claimed to be. Morris agreed with defense counsel's estimation that, fifteen minutes after the traffic stop, Morris arrested the front-seat passenger, who had misidentified herself to Morris.

After establishing those facts, Williams's attorney focused the questioning on Williams's presence in the back seat. When asked by counsel, Morris could not guess how much time had elapsed between the stop and the arrest of the passenger in the front seat. After the arrest, Morris asked the driver and Williams the identity of the woman Morris had just arrested for failure to identify herself. The driver gave Morris the front-seat passenger's name, and Morris agreed that, at that point, he had concluded his investigations into the traffic stop and the failure to identify.

4

Morris said that, at that point, he was investigating a third possible criminal act. Referring to the stop of the same car and the same two front-seat occupants a week earlier, Morris said that, on May 18,

> The driver was very hopped up, was sweating. It was very cold outside. Couldn't stand still. She -- her explanation for it was that she had a -- I believe she said schizophrenia or some sort of mental illness in [sic] which she was not currently on her medication for.
>
> I worked in the state hospital for over three years. I know what it looks like. And I also know what using meth looks like. And based off that, obviously -- she didn't get a blood test that night, but I could very well determine that she was on some sort of narcotic.
>
> So that, coupled with the fact that she's in the vehicle with the same person, led me to believe that there was a possibility of something else going on again.

Shortly after Morris arrested the front-seat passenger, Morris asked for, and the driver gave, consent to search the vehicle. Morris found a black nylon case on the back floorboard that had been at Williams's feet. He observed a Ziploc bag sticking out of the black case. In the baggy, he observed a white crystal-like substance. Williams denied ownership of the small bag. Several other empty Ziploc bags were in the black nylon case. Morris also found a bottle of liquid codeine with the label removed. Although not discussed at the suppression hearing, at punishment it was established that Williams had 5.25 grams of methamphetamine tucked in her pants.

1.      *Morris Did Not Impermissibly Extend the Traffic Stop*

Williams argues that Morris impermissibly extended the length of the traffic stop, rendering inadmissible the methamphetamine found on her person. We disagree.

5

"[S]topping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning" of the Fourth and Fourteenth Amendments to the United States Constitution, "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) (quoting *United States v. Place*, 462 U.S. 696, 722 (1983) (Blackmun, J., concurring)). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

"Additional facts and information discovered by an officer during a lawful detention may form the basis for a reasonable suspicion that another offense has been or is being committed." *Haas v. State*, 172 S.W.3d 42, 52 (Tex. App.—Waco 2005, pet. ref'd) (citing *Razo v. State*, 577 S.W.2d 709, 711 (Tex. Crim. App. [Panel Op.] 1979) ("[I]f, while questioning a motorist regarding the operation of his vehicle, an officer sees evidence of a criminal violation in open view, [o]r *in some other manner acquires probable cause* on a more serious charge, he may arrest for that offense and incident thereto conduct an additional search for the physical evidence."); *Attwood v. State*, 509 S.W.2d 342, 344 (Tex. Crim. App. 1974) (emphasis added)).

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to the trial court's determination of historical facts that turn on credibility and demeanor while reviewing de novo other application-of-law-to-fact issues.

*See Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000). Appellate courts should also afford nearly total deference to trial court rulings on application-of-law-to-fact questions, also known as mixed questions of law and fact, if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Appellate courts may review mixed questions of law and fact not falling within this category on a de novo basis. *Id.* We must affirm the decision if it is correct on any theory of law that finds support in the record. *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002).

Williams does not contest the validity of Morris's initial stop for the inconsistent license tags. Morris's testimony made clear that, immediately on reaching the car, he recognized it, the driver, and the front-seat passenger from the earlier traffic stop. Because that stop had left him and his sergeant with impressions that the front-seat passenger in the earlier stop had been untruthful about her name, Morris's suspicions were immediately raised. Morris's sergeant, who had been the lead officer on the May 18 stop, arrived at the scene of the May 26 traffic stop. Morris told his sergeant that this was the same girl from the recent traffic stop.

Williams asked Morris why he did not write the driver a ticket and let the three women leave, because instantly he knew of the conflicting license tags. Morris answered,

> Because, again, once I walked up and observed the front [driver] and right [front] passenger and recognized them from a previous stop in which I believed that one of them was being untruthful with their name, . . . it's my duty to pursue that to the full length of the law.

Morris conceded that the identity of the front-seat passenger "had no direct relation to the violation, the reason for the stop." But because he "fe[l]t that there was something else going

7

on" he was obligated to investigate. Based on his belief that the same woman had given him and his sergeant a false name eight days before, this suspicion was reasonable. Although he had not reviewed the dash-cam recording of the May 26 stop and did not remember several specifics of the incident, Morris agreed that he took the name given to him by the front-seat passenger and "ran" it or called it in to dispatch for confirmation and to check for warrants, then returned to the front-seat passenger and asked her name again.

Morris agreed with defense counsel's questioning that, by that point, ten minutes had elapsed in the stop, and he contacted dispatch for a physical description of the woman whose name the front-seat passenger gave him. Morris said he did this to be sure he was correctly remembering the front-seat passenger as the woman who had given an inconsistent if not false name to him and his sergeant during the May 18 stop. When the dispatcher responded that a Nancy Tunnell had a Texas driver's license describing her as five feet, five inches tall and weighing 250 pounds, Morris's suspicions were further aroused because the front-seat passenger did not appear to weigh that much. At that point, the sergeant returned to the police station and reviewed a photo of Tunnell. Dube radioed Morris from the police station and confirmed that the front-seat passenger was not Tunnell. Morris agreed with Williams's question that, about fifteen minutes into the traffic stop, he had arrested the front-seat passenger but had not yet issued any citation for the inconsistent license tags.

After arresting the passenger, he returned to the car and asked the driver and Williams if they knew the passenger's name. The driver provided it.[7] Morris said that, having determined

_____
[7]Eventually, the front-seat passenger was identified as Melissa Nicholas.

8

two violations had occurred—a traffic violation regarding the license tags, and failure to identify committed by the front-seat passenger—he began to investigate a potential third offense, but also immediately sought, and was given, consent to search. Morris acknowledged that, after arresting the front-seat passenger, he told the driver and Williams he could take them to jail for not telling him the front-seat passenger's name. At that point, the driver did tell Morris the front-seat passenger's name. Promptly, Morris asked to search the vehicle and received the driver's consent. That search revealed the contraband.

"A traffic stop made for the purpose of investigating a traffic violation must be reasonably related to that purpose and may not be prolonged beyond the time to complete the tasks associated with the traffic stop." *Lerma v. State*, 543 S.W.3d 184, 190 (Tex. Crim. App. 2018). When "the reason for the stop has been satisfied, the stop must end and may not be used as a 'fishing expedition for unrelated criminal activity.'" *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997) (quoting *Ohio v. Robinett*e, 519 U.S. 33, 41 (1996)) (Ginsberg, J., concurring) (quoting *State v. Robinette*, 653 N.E.2d 695, *rev'd*, *Ohio v. Robinette*, 519 U.S. 33 (1996)).

Although Morris stopped the vehicle for conflicting license plates, he immediately was presented with a possible offense of failure to identify.[8] He, with help from his sergeant, pursued the investigation of the front seat passenger's offense to its conclusion, when he arrested that passenger. That investigation could not be deemed a fishing expedition; he had encountered the same woman in the same suspicious circumstances eight days earlier. We find that Morris's

---

[8]This offense would have been a class B misdemeanor. *See* TEX. PENAL CODE ANN. § 38.02(b).

9

actions were "justified at [the] inception" of the stop. *Lerma*, 543 S.W.3d at 190. "An officer is also permitted to ask drivers and passengers about matters unrelated to the purpose of the stop, so long as the questioning does not measurably extend the duration of the stop." *Id.* Morris, here, was reasonably investigating another offense, failure to identify. From his testimony at the suppression hearing, Morris had not yet received answers to his warrant inquiries on the driver or Williams when he set about investigating the front-seat passenger's answers to his identity questions.

As soon as he resolved his investigation of the front-seat passenger by arresting her, Morris turned his focus on a possible third offense, because of his prior experience with the driver and the now-arrested front-seat passenger. He almost immediately asked the driver for permission to search the car, and she consented. "[A]n officer may request consent to search a vehicle after a completed traffic stop, but may not detain the occupant or the vehicle further if such consent is refused, unless there is reasonable suspicion of some criminal activity." *Magana v. State*, 177 S.W.3d 670, 673 (Tex. App.—Houston [1st Dist.] 2005, no pet.).

In contrast to the stop at issue here, in *Rodriguez v. United States*, 575 U.S. 348 (2015), the law enforcement officer stopped the car driven by Rodriguez, ran a check of Rodriguez's license plate, returned to the car, obtained the passenger's identification, and "ran" it. *Id.* at 351. At that time, the officer also called for a second officer and wrote a warning citation for Rodriguez. *Id.* The stopping officer later testified that he had completed all the tasks necessary for the traffic stop and "took care of all the business." *Id.* at 352. Still, the officer did not consider the men "free to leave" and asked permission to walk his drug dog around the vehicle.

10

Rodriguez refused.  *Id.*  The officer "then instructed Rodriguez to turn off the ignition, exit the vehicle, and stand in front of the patrol car to wait for the second officer."  *Id.*  When the second officer arrived, the first officer walked his dog around the vehicle, and the "dog alerted to the presence of drugs halfway through [the] second pass" around the vehicle.  *Id.*  A large amount of methamphetamine was discovered, which led to Rodriguez's conviction and appeals.

The United States Supreme Court rejected the Government's argument "that by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation."  *Rodriguez*, 575 U.S. at 357.  Rather, "[t]he reasonableness of a seizure . . . depends on what the police in fact do."  *Id.*  "How could diligence be gauged other than by noting what the officer actually did and how he did it?  If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'"  *Id.* (quoting *Caballes*, 543 U.S. at 407.)

In *Kothe v. State*, 152 S.W.3d 54 (Tex. Crim. App. 2004), an officer conducted a stop of a possibly intoxicated driver, Kothe.  *Id.* at 58.  Kothe's tag and driver's license numbers were submitted to dispatch.  *Id.*  The officer examined Kothe and found him not to be intoxicated.  *Id.*  The officer returned to his squad car to wait for a warrant check; no warrants were shown.  The officer was "prepared to release Mr. Kothe [when] he received a second dispatch which described Mr. Kothe and his car" and "stated that the sheriff's office had received a teletype earlier in the day that Mr. Kothe might be in possession of a blue bank bag containing old silver coins taken from someone's household safe.  The Fredericksburg police teletype requested that officers retrieve the bank bag and coins, but not arrest Mr. Kothe."  *Id.*  The officer inquired of

11

the bank bag, and Kothe said no such bag was in the vehicle. *Id.* Kothe, though, consented to a search of his car. *Id.* The officer found drug paraphernalia and questioned Kothe's girlfriend, who "was acting very nervous and said that she had two baggies of heroin, which Mr. Kothe had asked her to hold, in her bra." *Id.* The Texas Court of Criminal Appeals found the officer's actions and the detention reasonable, and Kothe's "consent to search his car was not unreasonably . . . tainted." *Id.* at 67.

The parties discussed *St. George v. State*, 237 S.W.3d 720 (Tex. Crim. App. 2007), at the suppression hearing, and Williams discussed it in his appellate brief. There, St. George was the passenger in a car driven by his wife. After a traffic stop, St. George gave officers a false name. *Id.* at 722. "[St. George] was arrested [for outstanding warrants for speeding and not having insurance] ten minutes after the citation was issued to the driver. In the search incident to arrest, the officers found marijuana in a pack of cigarettes in [St. George]'s pocket." *Id.*

> At the time the driver was issued the warning citation, the deputies did not have specific articulable facts to believe that Appellant was involved in criminal activity, thus, the questioning of Appellant regarding his identity and checks for warrants, without separate reasonable suspicion, went beyond the scope of the stop and unreasonably prolonged its duration.

*Id.* at 726. Importantly,

> the deputies did not learn that Appellant misidentified himself until after the driver was issued a warning citation. Therefore, giving a false name when officers did not know it was false could not give them reasonable suspicion to investigate further, nor was the fact that the dispatcher found no record of the first name given by Appellant sufficient to raise suspicion of criminal activity.

*Id. St. George* is distinguishable from our present case.

12

Denying Williams's motion to suppress, the trial court distinguished *St. George* "in that the stop [of the car with Williams in the back seat] was never terminated; it was an ongoing investigation . . . ." Unlike *Rodriguez* and *St. George*, the officer here had not completed his investigation into the traffic stop and immediately developed added suspicions. Rather, on contacting the car, he recognized the driver and front-seat passenger from the earlier suspicious incident. Morris immediately began to investigate that event, culminating in an arrest. Morris then turned his attention to the driver and Williams, and he very soon obtained consent to search the vehicle.

Based on the circumstances, we agree with the trial court. Morris had not completed his traffic stop. He spent the first significant part of his time investigating a misdemeanor offense, an investigation that was reasonable because of his recent interaction with the front-seat occupants of the car he stopped. He resolved that investigation and moved on to the traffic stop, then requested and was granted permission to search the car. He then discovered evidence leading to Williams's indictment and conviction.

Since Morris did not impermissibly extend the traffic stop, we overrule this point of error.

2.      *Williams Failed to Preserve Complaints Regarding Parole Law References*

Williams also complains of testimony elicited by the State and closing arguments by the State that referenced parole law. On review of the record, we find that these complaints were not preserved. We, therefore, overrule this point of error.

In its punishment case, the State elicited testimony from James Barton, a parole officer who had supervised Williams. Barton told the jury that, at the time of Williams's arrest on

13

May 26, 2018, she was on parole for another felony offense. Barton testified that Williams was sentenced to serve five years on that felony, but only served seven months. After that time, she had been released on parole and was in that status when arrested May 26. Barton also testified that Williams had convictions for three state jail felonies.[9]

Later, the State presented testimony from Stuart Nipper, a Gregg County narcotics investigator.[10] Regarding Williams's having served only a fraction of her five-year sentence, Nipper agreed with the State that the Texas Department of Criminal Justice was "churning [convicted inmates] out as quick as they get them." Nipper also agreed with the State that "big sentences" sometimes result in "a small amount of time that they're doing in prison" and that Nipper had "seen those same people with large sentences, 50-plus years, that have gotten out and [Nipper had] reworked cases and had to go back and send them to prison again."

In closing argument, the State referred to the trial court's charge instruction regarding parole law and argued to the jury, "And yes, there's instructions before that say you're not to do mathematical equations. But ladies and gentlemen, the evidence also involves a parole officer from TDC[J] who said she got five years and did seven months." During its deliberations, the jury sent a note to the trial court asking, "What is the legal difference in life and 99 year[s]." The jury assessed a sentence of ninety-nine years' confinement and a $10,000.00 fine.

---

[9]Our review of the record establishes that in August 2016, Williams was convicted of a state jail felony offense of possession of a controlled substance, where her prior state jail felony convictions enhanced her punishment to that of a third-degree felony. There Williams was sentenced to five years' confinement, and that is the sentence to which Barton referred.

[10]Nipper was presented as an expert in narcotics investigations and distribution.

14

To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling, if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2). Williams made no objections to the trial court about any of the above testimony or argument.

"The right to a trial untainted by improper jury argument is forfeitable . . . . In order to claim on appeal that an instruction to disregard was inadequate to cure erroneous jury argument, the defendant must object and pursue his objection to an adverse ruling." *Hernandez v. State*, 538 S.W.3d 619, 622 (Tex. Crim. App. 2018) (citations omitted). "Even an inflammatory jury argument is forfeited if the defendant does not pursue [her] objection to an adverse ruling." *Id.* at 622–23. Williams claims that she objected to Nipper's affirmative answer to the State's question, "They're churning them out as quick as they get them. That's what -- have you seen that?" In fact, Williams did not object to that question or Nipper's answer. Williams objected after two more questions by the State establishing that Williams's prior incarcerations had not corrected her criminal tendencies. When she did object, she complained that Nipper was testifying "beyond the scope of his testimony as far as being an expert in the drug trade."[11] That

---

[11]The testimony and Williams's objection played out as follows:

> [The State]: They're churning them out as quick as they get them. That's what --  have you seen that?

> [Nipper]: Yes, sir.

15

objection does not comport with Williams's appellate complaint that testimony was admitted that violated proscriptions on the considerations of the effects of parole law. A "point of error on appeal must comport with the objection made at trial." *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

Since this point of error has not been preserved, we overrule it.[12]

3.      *The Judgment Should be Modified to Correctly Show Williams's Pleas*

The parties agree that the trial court's judgment should be modified. The judgment incorrectly states that Williams pled "not guilty" to the indictment and fails to indicate that she pled "true" to the enhancement allegation.

"This Court may modify the trial court's judgment to make the record speak the truth when it has the necessary data and information to do so." *Jones v. State*, 600 S.W.3d 94, 101

---

[The State]: State, based on this evidence, did nothing to stop this defendant, would you agree?

[Nipper]: Yes, sir.

[The State]: TDC[J] prison has done nothing to stop this defendant?

[Nipper]: Correct.

[The State]: Based on the evidence I've just shown you, her crimes and criminal behavior has not lessened; it only increases.

[Defense Counsel]: Your Honor, I'm going to object. I think this goes beyond the scope of his testimony as far as being an expert in the drug trade. We're getting into punishment issues that's beyond him being an expert in the drug trade. We're talking about other things besides that.

[The Court]: Overruled. He can answer if he knows.

As can be seen, Williams did not timely object to the questions and answers that are part of her appellate complaint.

[12]In her brief, Williams asks that, if we find her argument unpreserved, which we do, we should construe her argument as an allegation of ineffective assistance of counsel for failing to make any preserving objections. We decline this invitation, because such a point has been inadequately briefed. *See Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000).

(Tex. App.—Dallas 2020, pet. ref'd) (citing TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd)).

Williams pled "guilty" to the indictment, without a plea agreement in place. She pled "true" to the State's punishment enhancement allegation.

We sustain this point of error and modify the judgment to reflect that Williams pled "guilty" to the indictment and "true" to the State's punishment enhancement allegation. As so modified, the trial court's judgment and sentence are affirmed.

Josh R. Morriss, III
Chief Justice

Date Submitted:    January 27, 2021
Date Decided:    March 16, 2021

Do Not Publish

17