**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| **STATE OF DELAWARE,** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | ID No. 2003012057 |
| | ) | |
| **DESMIN WALKER,** | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: October 7, 2021
Decided: October 12, 2021

**ORDER ON DEFENDANT'S
MOTION TO SUPPRESS**

Defendant, Desmin Walker ("Walker"), has filed a Motion to Suppress to challenge the admissibility of evidence resulting from a traffic stop of a vehicle that he was a passenger in resulting in his arrest. For the reasons that follow, Defendant's Motion to Suppress is DENIED.

On October 7, 2021, the Court held a hearing on the Motion to Suppress at which time Officer Neil Evans ("Evans") and Senior Probation Officer Dan Collins ("Collins") testified. Their testimony reveals the following facts which the Court finds were proven by the State by a preponderance of the evidence.

Evans testified that he has been a police officer for 14 years and has participated in the "Safe Streets Operation" for the last 5 years. Further, Evans testified that aside from his firearm related training in the police academy, he has

1

completed post-academy training. Evans also serves as an instructor to other officers training them how to recognize the signs to look for as to whether a person is carrying a weapon. Collins testified that he has been a probation officer for 18 years and has participated in the "Safe Streets Operation" for the last 11 years.

On March 26, 2020, Evans and Collins were on patrol in the area of the 300 block of East 24th Street in an unmarked police Durango. While traveling west bound in the 300 block of East 24th Street, Evans and Collins observed a Silver 2009 Toyota Camry approach the intersection of East 24th Street and North Jessup Street. The officers observed the vehicle fail to stop at a stop sign in making a left hand turn into the 2300 block of North Jessup Street, southbound. The officers conducted a traffic stop in the 300 block of East 23rd Street for the stop sign violation.

In approaching the vehicle, Evans approached from the driver's side and Collins on the passenger side. Evans observed Walker seated in the rear driver's side passenger seat staring directly in front of him, at the back of the driver seat, with a wide-eyed look on his face. Walker did not break this stare as Evans passed the rear driver side door and made contact with the driver. Based on Evan's experience and training, he thought Walker's behavior was odd because, during a traffic stop, most occupants of a vehicle would acknowledge the officers' presence in some way, either by looking at them or seeing what direction they are coming from.

While speaking with the driver, Evans stood next to the vehicle in a way that allowed him to view Walker. Evans asked the driver for her driver's license and paperwork for the vehicle. When the driver was getting her driver's license, Evans continued to monitor Walker who he observed to be visibly nervous. It was Evan's testimony that Walker was avoiding eye contact with him and breathing fast and heavy. Evans then knocked on Walker's window and asked him to roll it down so they could speak. When Evans asked Walker for identification, Walker looked at him with a panicked look and stated that he did not think that he had it. Evans asked Walker again if he had identification, prompting Walker to pat the exterior of his clothing all over in an attempt to locate his identification. Walker then began to reach towards the floorboard, and in doing so, grabbed the exterior of his right sweatpants pocket and immediately let it go. Evans noted that Walker had, in his left hand, a red cellphone.

Evans testified that he knew Walker's action of grabbing the exterior of his right sweatpants pocket, and then immediately letting it go was a "security check" — something subconsciously done by an individual to ensure that an object remains secure. Evans testified that as Walker grabbed the exterior of his sweatpants pocket, he observed a large solid mass, a bulge, which was completely concealed within the right front pocket of Walker's sweatpants. Evans testified that the "printing" or outline of the object was roughly the size of a firearm. When Walker let go of his

3

pocket, he pressed his right forearm over it. Walker again bent towards the floorboard, and in doing so shifted the right side of his body away from Evans. Evans testified that this behavior is known as "blading" — where an individual will shift their body away from an officer to prevent the officer from seeing the "printing" or outline of a firearm. Evans testified that he stopped Walker from reaching to the floorboard again because firearms are typically concealed under car seats. When Walker sat back up he again grabbed the bulge. It was at this point that Evans testified that he believed Walker had a firearm.

Evans did not, however, immediately remove Walker from the vehicle after determining that the concealed object in Walker's right front sweatpants pocket was probably a firearm based on the totality of circumstances which included Evans' experience and training. Evans testified that he felt more in control of the situation with Walker in the vehicle, and that it would not have been safe for him to remove Walker from the vehicle if he believed Walker did have a firearm. After additional units arrived at the scene to assist Evans, Walker was removed from the vehicle by Evans. Evans testified that as Walker was getting out of the vehicle he began to reach into his right front sweatpants pocket with his right hand. Evans gave Walker a loud, clear verbal command to take his hand out of his pocket, which Walker complied with. Evans then guided Walker out of the vehicle. Evans turned Walker around to face the vehicle while holding his right hand. Walker, on his own, pressed his hips

4

up against the rear driver-side quarter panel. Evans testified that this was a technique used by individuals as a "last chance" to conceal from officers what they do not want the officers to find.

Evans eventually conducted a pat down on Walker of the exterior of his right front sweatpants pocket. Evans further testified that based on his training and experience he knew all of Walker's actions to be consistent with the characteristics of a criminal gunman: visibly nervous and heavy rapid breathing; grabbing the exterior of his right pants pocket; pressing his right forearm tightly up against his right front sweatpants pocket as he moved around in the seat of the vehicle; turning the right side of his body away from Evans; and again, grabbing the object concealed in his pocket. Evans noted that although the driver was attempting to give him her driver's license and the required paperwork, Walker's actions were so concerning that Evans was unable to obtain her paperwork because he did not want to take his eyes off Walker for fear he may be armed with a firearm. When Evans conducted the pat down on Walker, he felt what he immediately knew to be a revolver concealed in his pocket. Walker was then taken into custody and Evans removed one (1) Silver Charter Arms Mode; U.C. lite .38 Special 5 shot revolver with a black handle and an obliterated serial number.

The driver and other passenger in the vehicle were also removed from the vehicle. Evans eventually obtained the driver's license and paperwork once Walker

5

was secured. Evans testified that the events set forth all took place within approximately five (5) minutes. The driver was ultimately issued a traffic ticket for failure to stop at a stop sign.

## **STANDARD OF REVIEW**

On a Motion to Suppress evidence in a *warrantless* search or seizure, "the State bears the burden of proof."[1]

Police officers are permitted to stop a motor vehicle based on a police officer's reasonable suspicion that the operator or occupant of the vehicle has committed or is committing a violation of the law, which includes traffic laws.[2]

A determination of reasonable suspicion is "evaluated in the context of the totality of circumstances to assess whether the detaining officer had a particularized and objective basis to suspect criminal activity."[3] The totality of circumstances of the surrounding situation is "viewed through the eyes of a reasonable, trained police officer in the same or similar circumstances, combining objective facts with such an officer's subjective interpretation of those facts."[4] Thus, when determining whether reasonable suspicion exists to justify a detention, a court "defers to the experience and training of law enforcement officers."[5]

---

[1] *Daniel Hunter v. State*, 783 A.2d 558, 560 (Del. 2001).
[2] *Heather Juliano v. State of Delaware*, 2020 WL 6815414 (Del. 2020); *State of Delaware v. William J. Prouse, III*, 382 A.2d 1359, 1361 (Del. 1978), *aff'd* 448 U.S. 647 (1979).
[3] *Jose Lopez-Vazquez v. State of Delaware*, 956 A.2d 1280, 1288 (Del. 2008).
[4] *Id.*, *Uriel C. Harris v. State of Delaware*, 806 A.2d 119, 127 (Del. 2002); *Joseph Jones v. State of Delaware*, 45 A.2d 865, 861 (Del. 1999); *Josiah Woody v. State of Delaware*, 765 A.2d 1257, 1263 (Del. 2001).
[5] *Josiah Woody*, 765 A.2d at 1263.

Since the motion challenges an officer's actions in removing an occupant of a vehicle out of it during a traffic stop, the burden is on the State to show the stop was reasonable by a preponderance of the evidence.[6]

The initial purpose of a traffic stop determines the duration and execution of the stop.[7] Any investigation beyond the initial purpose of the stop "must be supported by independent facts sufficient to justify the additional intrusion."[8] An officer must let a car go after issuing a citation or warning and running routine computer checks, unless he obtains voluntary consent from the driver or unveils independent facts to justify the encounter.[9] "Whether a given detention is unreasonably attenuated necessarily involves a fact-intensive inquiry in each case."[10]

An officer who initiates a lawful traffic stop may order the occupants of the vehicle out of it, and such an order does not constitute a seizure under the Fourth Amendment.[11] Additionally, an officer is justified in conducting a pat down search of a person where the officer possesses "reasonable suspicion that the person subject to the frisk is armed and dangerous."[12] The purpose of this law is "to balance two vitally important interests – officer safety and the right of the people to 'be secure in

---

[6] *State v. Dillard*, No. 1710003809, at *23 (Super. Ct. Mar. 16, 2018) (citing *State v. Abel*, 2011 WL 522126, at *2 (Del. Super. 2011), *aff'd*, 68 A.2d 1228 (Del. 2012), *as amended* (Jan. 22, 2013).

[7] *Caldwell v. State*, 780 A.2d 1037, 1047 (Del. 2001) (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)).

[8] *Caldwell*, 780 A.2d at 1047 (Del. 2001).

[9] *Id.*

[10] *Id.* at 1048.

[11] *Maryland v. Wilson*, 519 U.S. 408 (1997) (extending the holding of *Pennsylvania v. Mimms*, 435 U.S. 106 (1977), that an officer may order the driver out of a vehicle during a lawful traffic stop, to passengers.); *Loper v. State*, 8 A.3d 1169, 1174 (Del. 2010 (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 107-111 (1977)).

[12] *Calm v. State*, 226 A.3d 186, 191 (Del. 2020) (citing *Holden v. State*, 23 A.3d 843, 847 (Del. 2011)).

their persons … from unreasonable searches and seizures.'"[13] Thus, where a "police officer can articulate facts that cause [him] reasonably to suspect that a citizen is armed, a pat-down search is reasonable and therefore permitted in the interest of protecting the officer's safety."[14]

## ANALYSIS

Neither party challenges the initial traffic stop. The questions before the court are the officer's actions in removing Walker from the car and conducting a pat down search of his person.

I first address whether Evans was justified in removing Walker from the car. There is no question that Evans had the authority to order Walker out of the car during the lawful traffic stop and such an order did not constitute a seizure.[15]

The question at this point is whether Evans was justified in conducting a pat down on Walker. Walker argues that his rights were violated when Evans conducted a pat down because Evans did not have reasonable articulable suspicion that he was armed and dangerous. It is Walker's position that Evans acted on a mere hunch that he was armed with a firearm and because a hunch does not rise to the level of reasonable belief, the pat down was illegal. Further, Walker argues that Evans

---

[13] *Calm*, 226 A.3d at 191 (citing U.S. Const. amend. IV; Del. Const. art I, § 6).
[14] *Calm*, 226 A.3d at 191 (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).
[15] *Maryland v. Wilson*, 519 U.S. 408 (1997). *See also Holden v. State*, 23 A.3d 843, 847 (Del. 2011); *Loper v. State*, 8 A.3d 1169, 1174 (Del. 2010); *Mills v. State*, 2006 WL 1027202, at *2 (Del. 2006); *Ingram v. State*, 2004 WL 2154325, at *2 (Del. 2004); *Caldwell v. State*, 780 A.2d 1037, n. 27 (Del. 2001).

engaged in a "fishing expedition," when he focused his attention on Walker rather than the driver for failing to stop at a stop sign — the initial purpose for the stop – and thus Evans did not have the requisite reasonable suspicion to warrant the additional intrusion.

This Court does not agree with Walker that Evans engaged in a "fishing expedition" when he turned his attention to Walker instead of the driver, even though the initial purpose for the stop was the driver's failure to stop at a stop sign.[16] This Court finds that there was reasonable suspicion, supported by independent facts, to justify the additional intrusion. It was not until Evans approached the vehicle and witnessed Walker's behaviors that he shifted his attention from the driver to Walker. The Court finds, based on Evans' testimony and his training and experience, that Evans did not "employ marginally applicable traffic laws as a device to circumvent constitutional search and seizure requirements."[17] Rather, as Evans testified, Walker's actions were so concerning to him that he did not want to take his eyes off him for fear Walker may be armed with a firearm.

---

[16] *Caldwell v. State*, 780 A.2d 1037, n. 2 (Del. 2001) quoting *State v. Robinette,* 73 Ohio St.3d 650, 653 N.E.2d 695, 698–699 (1995), *rev'd* 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996)) ("While the legality of consensual encounters between police and citizens should be preserved, we do not believe that this legality should be used by police officers to turn a routine traffic stop into a fishing expedition for unrelated criminal activity.").
[17] *Caldwell*, 780 A.2d at 1048.

9

Also, the Court recognizes that a mere hunch is insufficient to justify a pat down.[18] However, this Court finds that the actions of Walker, as cited by Evans, give rise to more than a mere hunch. As to this issue, the Court finds *Holden v. State* and *State v. Chandler* instructive.

In *Holden*, the Delaware Supreme Court held that "[g]enerally, a pat down is justified based on the nature of the suspected crime, *a sudden reach by the individual, a bulge,* or a history with the specific individual."[19] In *Holden*, none of those factors were present, and rather, the sole basis for the officer conducting the pat down was because "it was [the officer's] policy to frisk a subject automatically before questioning him."[20] The Court explained that "[t]he relevant inquiry is 'whether a reasonably prudent man in the circumstances could be warranted in the belief that his safety or that of others was in danger.'"[21]

In *Chandler*, this Court held that, based on the totality of circumstances, the officer possessed reasonable, articulable suspicion that the defendant was armed and presently dangerous.[22] The Court relied on the defendant's "extreme nervousness, lack of eye contact, extensive narcotics and weapons criminal history, alias, and use

---

[18] *Hicks v. State*, 631 A.2d 6, 7 (Del. 1993) (11 *Del. C.* § 1903 and *Terry v. Ohio* "provide police with an absolute right to search a person for weapons if that person has been *legitimately* detained *and* the officer has a *reasonable belief* that the detainee is presently armed and dangerous).

[19] *Holden v. State*, 23 A.3d 843, 850 (Del. 2011) (emphasis added).

[20] *Id.*

[21] *Id.*

[22] *State v. Chandler*, 132 A.3d 133, 141-42. (Del. Super. 2015).

of a rental vehicle."[23] Specifically, the officer noted that the defendant appeared "more nervous than that of an average person during a traffic stop."[24] The officer indicated that the defendant's "hands were visibly shaking, his chest was visibly moving due to his heavy breathing, he avoided eye contact, and he fumbled with his license."[25] The facts of *Chandler* are analogous to the facts of this case.

In the instant case, during the stop, Evans noted that in approaching the vehicle to make contact with the driver he observed Walker to be starring directly in front of him at the back of the driver seat with a panicked look on his face. Based on his experience, Evans thought Walker's behavior was odd because most occupants of a vehicle would at least acknowledge officers' presence in some way, by looking at them or seeing what direction they may be coming from.

While speaking with the driver, Evans positioned himself in a way in which he could still observe Walker. Evans testified that he requested identification from Walker twice. The first time, Walker said that he did not know if he had it on him. The second time, Walker patted all over the outside of his clothing. Evans then observed Walker reach toward the floorboard and grab the exterior of his right sweatpants pocket, a maneuver Evans described as a "security check" – something subconsciously done by an individual to ensure that an object remains secured.

---

[23] *Id.* at 142.
[24] *Id.*
[25] *Id.*

Evans testified that as Walker grabbed the exterior of his sweatpants pocket, he observed a large sold mass, a bulge, which was completely concealed within the right front pocket of Walker's sweatpants. Evans testified that the "printing" or outline of the object was roughly the size of a firearm. When Walker let go of his pocket, he pressed his right forearm over it. Walker again bent towards the floorboard, and in doing, so shifting the right side of his body away from Evans. Evans testified that this behavior is known as "blading" – where an individual will shift their body away from man officer to prevent the officer from seeing the "printing" or outline of a firearm. Evans testified that he stopped Walker from reaching to the floorboard again because firearms are typically concealed under car seats. When Walker sat back up, he did another "security check," and grabbed the bulge. It was at this point that Evans testified that he believed Walker had a firearm.

When Walker was eventually removed from the vehicle, Evans opened the rear driver side passenger door and observed him begin to reach into his right front sweatpants pocket with his right hand. Evans gave Walker a loud, clear verbal command to take his hand out of his pocket which he complied with. When Walker was out of the vehicle he immediately pressed his hips up against the vehicle. Evans testified that, based on his training and experience, individuals will do this because it is their last chance to attempt to conceal from officers what they do not want the

officers to find. All these actions, Evans testified, he knew were consistent with characteristics of a criminal gunman, based on his training and experience.

This Court finds that a reasonably prudent man in Evans' position would be warranted to believe that his safety or that of others was in danger based on Walker's actions before Walker left the car. Once leaving the car, Walker's additional actions also provided additional reasonable suspicion to conduct the pat down. Therefore, Evans was justified in conducting a pat down of Walker.

**WHEREFORE**, for all the reasons stated herein, the Defendant's Motion to Suppress is **DENIED**.

**IT IS SO ORDERED.**

*/s/ Francis J. Jones, Jr.*
Francis J. Jones, Jr., Judge

cc:    Original to Prothonotary
       Alicea Brown, Assistant Public Defender
       Anthony Hill, Deputy Attorney General