The STATE of Ohio, Appellant,

v.

MELCHOR et al., Appellees.

[Cite as *State v. Melchor* (1996), 114 Ohio App.3d 534.]

Court of Appeals of Ohio,
Sixth District, Williams County.

No. WM–96–004.

Decided Oct. 4, 1996.

*William A. Bish*, for appellant.

*John S. Shaffer, Mitchell D. Kreither* and *Mark D. Berling*, for appellees.

Melvin L. Resnick, Presiding Judge.

This matter is before the court on appellant the state of Ohio's appeal pursuant to Crim.R. 12(J).

On July 7, 1995, Trooper Charles T. Williams of the Ohio State Highway Patrol was driving on the Ohio turnpike when he spotted a 1982 Buick Riviera traveling five miles over the posted sixty-five m.p.h. speed limit. He turned on his

overhead lights in an effort to stop the vehicle. One mile later, the vehicle, carrying two occupants, pulled off to the side of the highway. Trooper Williams approached the passenger side of the vehicle. Trooper Williams asked the driver for his license and registration. The driver gave Trooper Williams a Texas driver's license identifying himself as Jose Guadalupe Trevino of McAllen, Texas. The vehicle, bearing an Illinois license plate, was registered to Gustabo Barajas of Chicago. Trooper Williams then asked Trevino to have a seat in his patrol car.

Williams testified that within one minute of stopping the Buick, he radioed for backup assistance. Within three to four minutes, he asked Trevino to sit in the patrol car. After talking with Trevino for approximately two minutes, he called in a record check. Because the main computers were down, the results of the record check were delayed. Approximately nine minutes into the stop, he called for a canine unit for the purpose of detecting narcotics in the vehicle. Trooper Williams testified and a video tape of the stop shows that throughout the stop, Trevino repeatedly told Williams that he could search the vehicle though he ultimately declined to sign a consent form. Williams left Trevino and his passenger, Javier Melchor, with another trooper and began his search of the Buick.

In the Buick he found six air fresheners and a pair of pliers under the floor mat. He found glue in the glove box. The arm rests appeared to have been altered as the screws did not match the rest of the car's interior. When he opened the trunk, he detected a strong odor of marijuana. Williams went back to his patrol car to question Trevino and Melchor about the scent. Both men claimed to have no knowledge of the smell. Williams read the men their *Miranda* rights and went back to the Buick. A further search of the trunk revealed a hidden compartment. Carpet had been glued onto the compartment. Trooper Williams then decided to transport the Buick to a highway patrol maintenance garage for a more thorough search. At the garage, the canine unit arrived and immediately alerted the troopers of contraband in the Buick. Inside the right rear arm rest was $37,000 in cash. Trevino and Melchor claimed to have no knowledge of the money.

On July 19, 1995, Trevino and Melchor ("appellees") were each indicted on one count of engaging in a pattern of corrupt activity, a felony of the first degree, and one count of possession of criminal tools, a fourth degree felony. On October 17, 1995, the trial court granted appellees' motion to suppress. The state of Ohio now appeals, setting forth the following assignments of error:

"I. The trial court erred when it confused the necessity of probable cause to search a vehicle with specific and articulable facts necessary to expand and lengthen the traffic stop.

"II.    The trial court erred in finding that the appellee-Trevino's consent to the search was given during an illegal detention.

"III.    The trial court erred in suppressing the evidence secured by the search, *i.e.*, the hidden compartments and $37,000 in cash, since, even without the consent of appellee-Trevino, the evidence would have been inevitably discovered."

The state's three assignments of error will be considered together.

In granting appellees' motion to suppress, the trial court relied on the recent Ohio Supreme Court case, *State v. Robinette* (1995), 73 Ohio St.3d 650, 653 N.E.2d 695■ Paragraph two of the syllabus states:

"[T]he right, guaranteed by the federal and Ohio Constitutions, to be secure in one's person and property requires that citizens stopped for traffic offenses be clearly informed by the detaining officer when they are free to go after a valid detention, before an officer attempts to engage in a consensual interrogation. Any attempt at consensual interrogation must be preceded by the phrase 'At this time you are legally free to go' or by words of similar import."

The court applied this so-called "bright line test" and found that Trooper Williams illegally detained appellees.  Specifically, the court found that within five to six minutes of the stop, Trooper Williams should have told appellees they were legally free to go.  His failure to do so illegally broadened the scope of the original detention, which in turn resulted in Trevino's consent to search.

■    We conclude that the court erred in relying on the *Robinette* decision. *Robinette* was decided on September 6, 1995.  The incident giving rise to this appeal occurred approximately two months earlier on July 7, 1995.  The general rule in Ohio is as follows: "A decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation, and the effect is not that the former was bad law, but that it never was the law." *Peerless Elec. Co. v. Bowers* (1955), 164 Ohio St. 209, 210, 57 O.O. 411, 411, 129 N.E.2d 467, 468. However, with regard to Fourth Amendment rulings, the United States Supreme Court has cautioned that retroactive application "has been assessed largely in terms of the contribution retroactivity might make to the deterrence of police misconduct."  *United States v. Leon* (1984), 468 U.S. 897, 913, 104 S.Ct. 3405, 3415, 82 L.Ed.2d 677, 692.

The Ninth District Court of Appeals recently addressed the retroactivity of the *Robinette* decision in *State v. Gutierrez* (July 17, 1996), Medina App. No. 2515–M, unreported, 1996 WL 397140.  The *Gutierrez* court cited the three-part test set forth in *Chevron Oil Co. v. Huson* (1971), 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30

L.Ed.2d 296, 305–306, for determining whether a decision is to be applied nonretroactively. First, the decision must establish a new principle of law, either by overruling precedent or by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, the court must look to the prior history of a rule in question to determine whether retrospective application will retard its operation. Third, the court must weigh the inequity imposed by retroactive application. The *Gutierrez* court further cited *Leon* for the proposition that "no Fourth Amendment decision marking a 'clear break with the past' has been applied retroactively." *Gutierrez.*

The *Gutierrez* court concluded that *Robinette* has no retroactive application.

"*Robinette* establishes a bright-line test * * * and marks a clear break with the past. * * * Prior to September 6, 1995, there was no requirement that police officers warn motorists that they 'are legally free to go' before asking whether they would consent to a search. The resolution of the consent issue decided in *Robinette* was not foreshadowed; retroactive application would result in injustice by requiring adherence to a rule that did not exist and was not foreshadowed."

We agree with the analysis set forth in the *Gutierrez* and therefore conclude that the trial court erred in retroactively applying the *Robinette* holding to the facts in this case. Accord *Wadsworth v. Tomer* (1995), 73 Ohio Misc.2d 64, 657 N.E.2d 1387. See, also, *State v. Reed* (Aug. 21, 1996), Summit App. No. 17635, unreported, 1996 WL 471213 ("*Robinette* has no retroactive application to police conduct occurring prior to September 6, 1995.").

■ Where a police officer has a reasonable and articulable suspicion of criminal activity, the officer may make a brief, investigative stop. *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Trooper Williams testified he was traveling on the turnpike at sixty-five m.p.h., the posted speed limit, when he observed appellees' vehicle pulling away from him. Based on these specific and articulable facts, we conclude that it was reasonable for Williams to suspect that Trevino was violating R.C. 4511.21 by driving over the speed limit. Thus, Williams's initial stop of appellees' vehicle was valid.

■ An investigative stop may last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229; *United States v. Brignoni–Ponce* (1975), 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607. During a lawful, investigative traffic stop, an officer may request the operator's license and run a computer check on the license, registration and plates. *Delaware v. Prouse* (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660. While the lawfulness of the initial stop will not support a "fishing expedition" for evidence of another crime, *State v. Bevan* (1992), 80 Ohio App.3d 126, 129, 608 N.E.2d 1099, 1100–1101, circumstances attending an otherwise

proper stop may give rise to a reasonable suspicion of some other illegal activity different from the activity which triggered the initial stop. *State v. Myers* (1990), 63 Ohio App.3d 765, 580 N.E.2d 61.

Trooper Williams testified he was a member of the State Highway Patrol's drug interdiction force. As a member, he had received special training from the Highway Patrol Academy in drug identification and search and seizure law. He had also received training from the Drug Enforcement Administration. After stopping appellees for speeding, Williams approached the passenger side of the Buick. Melchor opened the passenger door. Williams immediately noticed, in plain view, new, shiny screws in the door jamb and protruding fabric on the arm rests. These two factors led Williams to suspect the vehicle had been altered. Williams testified that cars such as the one appellees were in are often altered to include hidden compartments which in turn are used for transporting contraband. Williams also immediately noticed a strong odor of air freshener.

In the patrol car, Trevino told the trooper that he could search the Buick. Williams instead chose to ask Trevino more questions. Trevino told Williams that he was returning from Toledo. When asked why he was in Toledo, Trevino answered that he had gone there to see a woman whose address he did not know. He stated that he was in Toledo for approximately four hours before heading back to Chicago. Trevino claimed that he lived in Texas but worked for a construction company in Chicago. He stated that he did not know the owner of the Buick. He also told Williams that he had recently purchased the Buick. When Williams asked Trevino how long ago he had purchased the Buick, Trevino answered that he had not purchased it because he did not have the money but that he wanted to purchase it. He also claimed to have gotten a ride from Texas to Chicago with "some guy."

Trooper Williams left Trevino in the patrol car and approached Melchor. Melchor stated that he had met Trevino in a bar and he was not sure where in Ohio they had traveled. Melchor claimed to reside in Chicago. He stated that the owner of the Buick was a friend of Trevino.

In sum, Trooper Williams testified that he detained appellees for twenty minutes because (1) Trevino drove for one mile before he heeded Williams's siren; (2) the door jambs appeared altered; (3) there was a strong odor of air freshener emanating from the Buick; (4) the owner of the Buick was not present; (5) Trevino was from McAllen, Texas, a town close to Mexico and known as a "high source drug area"; (6) Trevino and Melchor gave conflicting stories; and (7) Trevino contradicted himself.

This court has previously reviewed fact patterns similar to the present case in *State v. Smotherman* (July 29, 1994), Wood App. No. 93–WD–82, unreported,

1994 WL 395128; *State v. Correa* (1995), 108 Ohio App.3d 362, 670 N.E.2d 1035; and *State v. Gonyou* (1995), 108 Ohio App.3d 369, 670 N.E.2d 1040. The *Correa* court stated as follows:

"In *State v. Smotherman* * * * this court recently noted a certain similarity in the 'patterns and practices' of the officers in that case and in numerous other 'Ohio cases' which led to the conclusion that they are following a 'script' suggested in their drug interdiction training which calls for prolonging a traffic stop to 'fish' for evidence of drug activity and seek consent to search the vehicle well after the stop should have been terminated. This court noted further that the practices of separating an individual from his car and engaging the individual in 'casual conversation' in order to observe 'body language' and 'nervousness' are commonly implemented by officers trained in drug interdiction. See *State v. Retherford* (1994), 93 Ohio App.3d 586 [639 N.E.2d 498]; *State v. Medina* (Apr. 13, 1994), Montgomery App. No. 13883, unreported [1994 WL 124807]; *State v. Pinder* (Dec. 15, 1993), Miami App. No. 93–CA–6, unreported [1993 WL 518692]; *State v. Foster* (1993), 87 Ohio App.3d 32 [621 N.E.2d 843]. Upon consideration thereof, this court determined in *Smotherman* that the above practices are 'manipulative' and that:

" 'Reasonable suspicion that a detainee is engaged in criminal activity must exist for as long as the detention does. *The lawfulness of the initial stop will not support a "fishing expedition" for evidence of crime. State v. Bevan* [ (1992), 80 Ohio App.3d 126, 130, 608 N.E.2d 1099, 1101–1102].' (Emphasis added.)" 108 Ohio App.3d at 368, 670 N.E.2d at 1039.

In the *Correa* case, Trooper Stidham stopped a vehicle he observed traveling below the speed limit and weaving. Stidham asked for the driver's license and registration. He also asked the driver to step out of the car. Two minutes later, Trooper Stockman arrived with a narcotics dog. Both troopers questioned the driver as to where he had come from and his ultimate destination. Stidham placed the driver in his patrol car and proceeded to run a check on his criminal history. Stockman approached the stopped vehicle and questioned the passenger. Stockman reported that he received conflicting information regarding the driver's and passenger's destination. While Stidham was still waiting for a response regarding the criminal check, the troopers decided to walk the dog around the vehicle. The dog alerted the troopers to two bundles of marijuana under the front seat.

At a suppression hearing, Stidham testified that he pulled the vehicle over because he suspected that the driver was either tired or intoxicated. After talking to the driver and watching him get out of the car, Stidham was satisfied that the driver was not intoxicated. However, Stidham testified that because the

vehicle's occupants appeared nervous and because they gave conflicting stories, he became suspicious that the occupants were involved in other criminal activity. On appeal, this court found that the driver's suppression motion should have been granted in that the portion of Stidham's inquiry which occurred after he determined that appellant was not intoxicated went beyond the scope of that which was necessary to effectuate the purpose of the stop and was therefore outside the bounds of a constitutionally permissible detention.

In *Gonyou*, a driver was stopped for driving seventy-one miles per hour in a sixty-five-miles-per-hour zone. The trooper testified that his intention in stopping the vehicle was to give the driver a speed warning. When he approached the vehicle, he noticed, in plain view, that the interior was littered with fast food wrappers and partially eaten chicken. The driver produced a valid Texas driver's license indicating he was from Splendora, Texas. This prompted the trooper to ask the driver if there was a significant drug problem in Splendora. The trooper testified that the driver answered "no" and quickly looked away. The trooper testified that this action, together with the littered interior, aroused his suspicion. The trooper then brought the driver back to his patrol car to run a criminal record check and to find out if his license was valid. Thirteen minutes into the stop, the trooper's partner arrived. His partner detected the smell of raw marijuana from the vehicle. Several minutes later, a canine unit alerted the troopers to marijuana in the vehicle.

On appeal, this court ruled in favor of the defendant.

"When [the trooper] asked questions irrelevant to the original purpose of the stop, he was expanding the investigative scope of the detention. Until that questioning, drugs were not material to the purpose of the stop. Where appellant was going, where he was from and whether Splendora, Texas, had a drug problem are not relevant to whether a speeding law was violated. Appellee points to no evidence beyond the clutter of food wrappers and the container of partially eaten chicken that precedes the drug related questioning. According to [the trooper] testimony, his suspicions were based only on the condition of the interior of the car and the response to these questions. The trooper did not observe the suspicious behavior (nervousness) until it was elicited by the pointed questioning. Additionally, the purpose of the questioning, according to [the trooper's] partner, was 'to raise a reasonable suspicion that maybe criminal activity is going on.'

"The tactics employed by the drug interdiction unit in this specific case are, in our view, clearly manipulative practices designed to expand the scope of the investigation beyond the parameters warranted by the initial stop. As such, they

are violative of the Fourth and Fourteenth Amendments to the Constitution of the United States and Article I, Section 14 of the Ohio Constitution. Accordingly, the trial court erred in failing to suppress evidence which was the fruit of the ensuing search." *Gonyou*, 108 Ohio App.3d at 372-373, 670 N.E.2d at 1042.

The facts in the instant case are distinguishable from those cited above. Although Williams detained appellees for approximately twenty minutes before conducting a search of the Buick, the record shows that Trevino, unsolicited, gave Williams consent to search the Buick at least four minutes into the stop. The timing of this consent is especially significant as it was given before Williams had concluded the scope of his initial, valid stop, specifically, before Williams confirmed the validity of Trevino's license and had gotten results from the record check. Based on the totality of the circumstances, including Trooper Williams's experience, we conclude that he articulated sufficient additional facts to support a reasonable suspicion of separate illegal activity, specifically drug activity, on the part of appellees. Therefore, his continued detention of appellees was lawful. Appellant's three assignments of error are found well taken.

On consideration whereof, the court finds that substantial justice has not been done the party complaining, and the judgment of the Williams County Court of Common Pleas is reversed. This cause is hereby remanded for disposition consistent with this opinion. Costs assessed to appellees.

*Judgment reversed*
*and cause remanded.*

SHERCK, J., concurs.

ABOOD, J., concurs in judgment only.