[Cite as *State v. Reynolds*, 2022-Ohio-3506.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio/City of Bowling Green

    Appellee

v.

Erika Reynolds

    Appellant

Court of Appeals No.  WD-21-084

Trial Court No.  21-TRC-00695

**DECISION AND JUDGMENT**

Decided:  September 30, 2022

* * * * *

Hunter Brown, City of Bowling Green Prosecuting Attorney, and
Nicholas P. Wainwright, Assistant Prosecuting Attorney, for appellee.

Michael B. Kelley, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Following a jury trial, defendant-appellant, Erika Reynolds, appeals the
November 16, 2021 judgment of the Bowling Green Municipal Court, convicting her of
operating a vehicle while under the influence of drugs or alcohol.  For the following
reasons, we affirm the trial court judgment.

## I.     Background

{¶ 2} A jury convicted Erika Reynolds of operating a vehicle while under the influence of drugs or alcohol, a violation of R.C. 4511.19(A)(1)(a).  She was sentenced to 93 days in jail, 90 days of which were suspended, a fine of $1,075.00, court costs, and a one-year license suspension.  The state offered the following evidence at trial.

{¶ 3} On February 13, 2021, at approximately 3:30 p.m., Ohio State Highway Patrol Trooper Nicholas Palmer was patrolling a stretch of I-75 in Wood County when he received a call from dispatch reporting a reckless driver.  Palmer located the vehicle— Reynolds's vehicle—and followed it.  He observed the vehicle swerve within its own lane and ride on top of the lane divider, which he conceded are *not* traffic violations in this judicial district.  He ultimately initiated a stop of the vehicle because it was traveling 75 miles per hour in a 70-mile-per-hour zone.  Palmer testified that it is not his usual practice to stop a vehicle for exceeding the speed limit by only five miles per hour, and, in fact, he did not cite Reynolds for speeding.  Palmer confirmed that varying speeds can be a sign of impairment, as can following too closely, but he clocked Reynolds's speed only once, she was not following too closely, he did not see her drive recklessly, and he observed no other traffic violations.  He also confirmed that Reynolds maneuvered her vehicle appropriately when he pulled her over.

{¶ 4} Palmer approached the vehicle, requested Reynolds's driver's license, registration, and proof of insurance, and asked general questions so that he could evaluate

2.

whether she was impaired. He noticed that her speech was slurred, her eyes were bloodshot and glassy, and her movements were lethargic. This indicated to Palmer that Reynolds could be impaired by drugs, alcohol, prescription medications, or a medical condition. He decided to extend the stop to further investigate.

{¶ 5} Palmer asked Reynolds if she had had anything to drink. She said no. After a consensual pat down for weapons, he performed several field sobriety tests. He began by asking if she had medical conditions or injuries that would prevent her from performing the tests, and specifically whether she had any medical conditions that would prevent her from seeing the tip of his pen for the horizontal gaze nystagmus (HGN) test. She said no, although she explained that she had monocular vision. Palmer administered the test, and he observed six out of six clues. He performed the vertical gaze nystagmus test, and nystagmus was present. Palmer next asked Reynolds if she had any physical or mental ailments that would prevent her from performing the walk-and-turn test. Reynolds said she had back pain and a knee abscess, but she performed the test. She swayed while balancing, moved her foot, and became agitated. Palmer then asked her to do the one-leg-stand test. She indicated that her abscess was on her left leg. She stood on her right foot and lifted her left foot. Reynolds said that she could not do the test.

{¶ 6} Palmer administered a preliminary breath test, which showed zero alcohol on Reynolds's breath, so he eliminated alcohol as a possible reason for impairment. At that point he suspected that Reynolds's impairment was caused by a controlled substance

3.

or prescription medication. He performed a modified Romberg test. He asked her to close her eyes, tilt her head back, put her arms down by her side, estimate the passage of 30 seconds, then bring her head back and tell him to stop. She estimated the passage of 30 seconds in 22 seconds—the normal range would have been 25 to 35 seconds. While she performed the test, Palmer observed body tremors, another indicator of impairment.

{¶ 7} Based on "the driving behavior," the reckless operating call, and Reynolds's performance on the field sobriety and modified Romberg tests, Palmer decided to place Reynolds under arrest. He read Reynolds her Miranda rights and performed a search incident to arrest. At some point during the stop, Reynolds told Palmer that she takes multiple medications.

{¶ 8} Because Palmer suspected that Reynolds's medications caused her to become impaired, he called dispatch to see if a drug recognition expert ("DRE") was available. Officer Amber Moomey, of the Bowling Green Police Department, evaluated Reynolds.

{¶ 9} Moomey testified that she was designated a DRE in 2018, after completing additional training. She stated that the methods she learned in her DRE training are generally recognized in her field and are relied upon by other police departments. Without objection from defense counsel, the court recognized Moomey as an expert. Moomey authored a report that was admitted into evidence, summarizing her evaluation of Reynolds.

4.

{¶ 10} Before Moomey began her evaluation, Palmer told her only that it was a reckless operation case. He said that he had responded to a call of an impaired driver. Palmer was administering a breath alcohol test when Moomey arrived, so she waited until he was finished. That test indicated that Reynolds was not impaired by alcohol. Because the average police officer cannot determine non-alcohol-related impairment, Moomey forms her own opinion of a person's impairment based on information she has learned about what drugs do to the body. She does not take the trooper's word as to whether a person is impaired.

{¶ 11} Moomey noted Reynolds's clothing, including her shoes—she was wearing tall black boots. When Reynolds walked from the BAC room to the squad room, Moomey noticed that Reynolds sometimes walked with a limp and was unsteady on her feet. Before talking with Reynolds, she read her Miranda rights. At that point, she noticed that Reynolds's eyes were bloodshot and glassy, she had thick, slurred speech, she was fidgety during the evaluation, and she was constantly moving.

{¶ 12} In response to questions from Moomey, Reynolds said that she had not eaten that day and had last eaten the following night at 8:00 p.m. Between noon and 3:35 p.m., Reynolds consumed three Bang energy drinks. The night before, she slept from 1:00 a.m. until noon. Reynolds told Moomey she is not diabetic or epileptic; she has an abscess on her knee that makes it painful to walk sometimes; she had a lazy eye that was corrected; and she has monocular vision. She is on 14 different medications, including

5.

Lyrica, Adderall, Xanax, oxycodone, lidocaine patches, Zoloft, Valtrex, valcyclovic, acyclovic, an inhaler, propranolol, hydroxyzine, Zofran, and Phenergan. Moomey documented the medications, side effects, and when Reynolds last took them.

{¶ 13} Moomey examined Reynolds's eyes, then performed both HGN and VGN tests. Reynolds exhibited six out of six clues on the HGN test and vertical gaze nystagmus was present on the VGN test. Moomey administered the modified Romberg test—Reynolds estimated the passage of 30 seconds after only 21 seconds. Moomey administered the walk-and-turn test—Reynolds fell out of the start position twice, started crying, attributed her difficulty to her boots, removed her boots, had trouble remembering the instructions, and lost her balance. Moomey administered the one-leg-stand test for each leg—Reynolds could not maintain balance and put her foot down several times. Moomey administered the finger-to-nose test—Reynolds did not follow instructions properly and she double-tapped once.

{¶ 14} Based on the totality of the circumstances, Moomey determined that Reynolds was impaired by a CNS depressant. She explained that this is a large category of medication or drugs that depress one's central nervous system. She did not believe that any medical or mental ailment caused Reynolds's impairment. She "saw the presence of CNS depressant, so [she] call[ed] it a CNS depressant." Moomey entered Reynolds's medications into www.drugs.com and looked for interactions. She said six of

6.

Reynolds's medications "had a major drug interaction," while others had "a moderate interaction."

{¶ 15} Moomey described that after the evaluation, she went through each medication and made herself familiar because "[t]here are so many different medications out there, that [she's] not familiar with every single one of them or what they do." She testified that oxycodone and Zoloft "counteract with each other and can cause some pretty severe side effects," which she described in her report. She then summarized what she learned about some of the different medications Reynolds is prescribed:

- Xanax: "a depressant and it depresses your immune system and it helps treat medical conditions";
- Oxycodone: "a narcotic analgesic, which would be in the same category as, like, Heroin or Fentanyl";
- Zoloft: "another depressant in the CNS depressants category"; and
- Zofran: "it's for nausea, but I believe it's in the CNS depressant category."

{¶ 16} Moomey emphasized that Reynolds was drowsy despite the three energy drinks she consumed, but she was also fidgety. She believed this was because "there was still a lot bringing her down." She said that the combination of a CNS depressant and narcotic analgesic will lower blood pressure (Reynolds's blood pressure was 108/72), body temperature (her temperature was 97.6), and pulse rate (her pulse rate was checked

7.

three times and was recorded as 98, 106, 96). Moomey concluded, "based on everything she encountered throughout the evaluation," that Reynolds's "signs matched up with CNS depressant."

{¶ 17} On cross-examination, Moomey testified that from her review of the recording of the traffic stop, Reynolds did not appear to have any difficulty with her motor vehicle controls and no difficulty exiting the vehicle, and she did not repeat herself. Moomey conceded that she is not a doctor or a pharmacist. She testified that a person can be impaired while driving and not make a traffic violation.

{¶ 18} Defense counsel made Crim.R. 29 motions after the state's evidence and again after resting. The court denied those motions and submitted the matter to the jury. The jury returned a verdict of guilty. Reynolds appealed. She assigns the following errors for our review:

> I.    Appellant's conviction was against the manifest weight of the evidence and the evidence was insufficient to support a conviction.
>
> II.   Appellant received ineffective assistance of counsel due to counsel's serious errors which deprived Appellant of a fair trial because counsel failed to raise significant issues in a motion to suppress although it had merit, and because the cumulative effect of counsel's errors resulted in ineffective assistance of counsel as a whole.

8.

## II.    Law and Analysis

### A. Manifest Weight and Sufficiency of the Evidence

{¶ 19} In her first assignment of error, Reynolds challenges the sufficiency and manifest weight of the evidence. She argues that the state did not present admissible evidence that "her ability to operate [her] vehicle" was "noticeably impaired," thus the evidence was insufficient to support her conviction. Although not assigned as a separate error, Reynolds complains that Palmer and the assistant prosecutor repeatedly made reference to the dispatch call that indicated that Reynolds was driving recklessly, even though the court had ruled that it could be alluded to only to show that the officer went to look for her after receiving this call.

{¶ 20} Reynolds further claims that the field sobriety tests were not properly administered because Palmer failed to ask about medical conditions that could affect HGN, he held the pen out for seven seconds instead of five, he failed to account for Reynolds's back pain, back injury, knee abscess, or lazy eye, and the cold temperature may have affected her performance. She insists that Moomey's administration of other field sobriety tests suffer from similar infirmities, and additional tests Moomey administered were not properly demonstrated and were unreliable. Reynolds maintains that Palmer did not know the effects of drugs on people and saw nothing on any pill bottles to suggest that Reynolds should not have been driving. Finally, Reynolds

9.

contends that Moomey is not a pharmacist and does not know how Reynolds's medications may interact.

{¶ 21} The state responds that it was not required to show that Reynolds's *driving* itself was impaired—it is sufficient that the officer observe indicia of impairment after the lawful stop of the vehicle. It emphasizes that the court permitted it to reference the reckless-driving call "with an admonishment to the jury that it's not offered for the truth of the matter in the statement itself," but rather to show "that the officer acted in conformity therewith." "As such," the state claims, "the Jury gained very small information about the call and were told not to consider it," and it can be presumed that the jury followed the instruction to disregard inadmissible evidence. Finally, the state argues that indicators of impairment were observed after the stop and were observed during administration of the HGN and VGN, walk-and-turn, modified Romberg, and one-leg-stand tests. It does not specifically address the remainder of Reynolds's arguments.

### 1. Sufficiency of the Evidence

{¶ 22} Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In reviewing a challenge to the sufficiency of evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668

10.

(1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Walker,* 55 Ohio St.2d 208, 212, 378 N.E.2d 1049 (1978). "Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. Naturally, this requires "a review of the elements of the charged offense and a review of the state's evidence." *Id.*

{¶ 23} R.C. 4511.19(A)(1)(a) prohibits the operation of a vehicle when a person is under the influence of alcohol, a drug of abuse, or a combination of both. A "drug of abuse" is defined in R.C. 4506.01(M) to mean "any controlled substance, dangerous drug as defined in section 4729.01 of the Revised Code, or over-the-counter medication that, when taken in quantities exceeding the recommended dosage, can result in impairment of judgment or reflexes." "Dangerous drug" is defined by R.C. 4729.01(F) to include prescription medications. "Controlled substance" is defined by R.C. 4506.01(E) as "(1) [a]ny substance classified as a controlled substance under the 'Controlled Substances Act,' 80 Stat. 1242 (1970), 21 U.S.C.A. 802(6), as amended; (2) [a]ny substance included in schedules I through V of 21 C.F.R. part 1308, as amended; (3) [a]ny drug of abuse."

{¶ 24} To support a conviction of operating a vehicle while under the influence of a drug of abuse, the state must prove, beyond a reasonable doubt, that the defendant was "(1) operating a vehicle, and (2) doing so while under the influence of a drug of abuse." *State v. Hefflinger,* 6th Dist. Erie No. E-16-054, 2017-Ohio-7100, ¶ 17. In *Hefflinger*, we

11.

recognized that under Supreme Court of Ohio case law—*State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993—"the testimony of an experienced police officer that a defendant appears to be under the influence of a drug of abuse at the time of arrest, paired with additional evidence that the defendant had ingested a drug of abuse, constitutes sufficient evidence to support a conviction for operating a vehicle while under the influence of a drug of abuse." *Id.* at ¶ 22.

{¶ 25} A driver is "under the influence" when his or her normal "physical and mental ability to act and react" are altered because of the consumption of a drug of abuse. *See State v. Filip*, 2017-Ohio-5622, 94 N.E.3d 125, ¶ 38 (9th Dist.). "One can be 'under the influence of a drug of abuse' even when taking a prescription medication in the prescribed amount if it impairs the person's ability to operate a motor vehicle." *State v. Smith*, 6th Dist. Ottawa No. OT-97-037, 1998 WL 102143, *1 (Feb. 27, 1998).

{¶ 26} Importantly, despite Reynolds's suggestion to the contrary, "the state does not have to prove actual impaired driving; instead, it [need] only show impaired driving ability." *State v. Schlagheck*, 6th Dist. Lucas No. L-00-1121, 2001 WL 85158, *8 (Feb. 2, 2001). The state may rely on physiological factors, such as glossy or bloodshot eyes, slurred speech, and confused appearance, to demonstrate that a person's physical and mental ability to drive was impaired. *Id.*

{¶ 27} Here, it is undisputed that Reynolds was operating a vehicle. As for whether she was "under the influence of a drug of abuse," the state presented evidence

12.

that Reynolds exhibited physiological signs of impairment, including glassy, bloodshot eyes, slurred speech, and lethargic movements. It presented evidence that she exhibited clues of impairment in two sets of field sobriety tests administered independently by both Palmer and Moomey. And it presented evidence that Reynolds admitted taking certain prescribed medications that constitute "drugs of abuse."[1] The state was not required to show that Reynolds was driving recklessly. The evidence, if believed, was therefore sufficient to support her conviction.

{¶ 28} As for Reynolds's claim that field sobriety tests were not properly administered, that argument is more appropriately considered in addressing her second assignment of error.

### 2. Manifest Weight of the Evidence

{¶ 29} When reviewing a claim that a verdict is against the manifest weight of the evidence, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the state. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of

---

[1] We note that while the state repeatedly stated that Reynolds took 14 medications, Moomey's report indicates that she took only six of those prescribed medications that day. She had taken others the night before.

13.

the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L–10–1369, 2012–Ohio–6068, ¶ 15, citing *Thompkins* at 388. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 30} Although under a manifest-weight standard we consider the credibility of witnesses, we must nonetheless extend special deference to the jury's credibility determinations given that it is the jury who has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14.

{¶ 31} Reynolds maintains that Palmer did not know the effects of drugs on people and saw nothing on any pill bottles to suggest that Reynolds should not have been driving. She also contends that Moomey is not a pharmacist and does not know how Reynolds's medications may interact. Problematically, Reynolds did not object to the state's request to qualify Moomey as a drug recognition expert, nor did she object to the admissibility of Moomey's observations and opinions.

{¶ 32} In any event, while it is true that the state must provide evidence of "a nexus between the ingestion of a substance of abuse and the driver's impairment"— *State v. Love*, 7th Dist. Columbiana No. 21 CO 0009, 2022-Ohio-1454, 188 N.E.3d 622, ¶

14.

15, *appeal not allowed*, 167 Ohio St.3d 1482, 2022-Ohio-2765—the Ohio Supreme Court has recognized that "[w]hen the effects of a drug are sufficiently well known * * *[,] expert testimony linking ingestion of the drug with indicia of impairment is unnecessary." *Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, at ¶ 19. In *Richardson*, the drug at issue was hydrocodone and the court found that the effects of hydrocodone—a Schedule II controlled substance—are well known, therefore, expert testimony establishing the nexus was unnecessary. So too are the effects of oxycodone, also a Schedule II controlled substance, which Reynolds admitted to ingesting. *See* https://www.deadiversion.usdoj.gov/schedules/orangebook/c_cs_alpha.pdf (last accessed September 12, 2022). *See also State v. Wieser,* 3d Dist. Allen No. 1-18-15, 2018-Ohio-3619, ¶ 17 (explaining that for purposes of an OVI charge, the issue of whether a drug is a controlled substance is a question of law for the court).

**{¶ 33}** Moomey's opinions concerning Reynolds's impairment could be considered, therefore, despite her lack of expertise in the field of pharmacy. It was up to the jury to assign weight to her testimony. And given Moomey's opinions, Palmer's observations, and Reynolds's performance on field sobriety tests—which was recorded and played for the jury—we cannot say that the jury clearly lost its way in resolving evidentiary conflicts simply because it chose to believe the evidence presented by the state. *State v. Martin-Paley,* 12th Dist. Warren No. CA2020-05-032, 2021-Ohio-1631, ¶

15.

22 ("The jury is free to believe or disbelieve all, or part of, the evidence presented at trial.).

{¶ 34} Finally, although not assigned as a separate error, Reynolds complains that Palmer and the assistant prosecutor repeatedly made reference to the dispatch call that indicated that Reynolds was driving recklessly, even though the court had ruled that it could be alluded to only to show that the officer went to look for the individual after receiving this call. It is true that this call was referenced several times and that Palmer supplied more information about the call than was permitted. But trial counsel registered timely objections that the trial court sustained, and the jury was instructed that the content of the dispatch call could not be considered for the truth of the matter. We will generally presume that the jury followed the trial court's limiting instructions. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 69; *State v. Thomas*, 6th Dist. Lucas No. L-17-1266, 2019-Ohio-1916, ¶ 32.

{¶ 35} Accordingly, we find Reynolds's first assignment of error not well-taken.

### B. Ineffective Assistance of Counsel

{¶ 36} In her second assignment of error, Reynolds argues that trial counsel was ineffective because he failed to file a motion to suppress evidence on the basis that (1) the officer lacked reasonable, articulable suspicion to stop her for driving five miles per hour over the speed limit and to detain her to administer field sobriety tests; (2) the tests were not performed in substantial compliance with the standards for administering such tests

16.

given that the HGN was held for seven seconds instead of five, Reynolds had numerous medical problems, and unusual circumstances—including the cold weather—affected the tests; and (3) Palmer could not remember if he Mirandized Reynolds before she admitted that she was prescribed and used 14 medications.

{¶ 37} The state responds that an officer may stop a driver for a de minimis traffic violation, and Reynolds's glassy bloodshot eyes, slurred speech, and lethargy provided the officer with reasonable, articulable suspicion to detain her for the purpose of administering field sobriety tests. It insists that the field sobriety tests were performed in substantial compliance with NHTSA standards. Finally, the state responds that even if Reynolds made admissions to Palmer before she was Mirandized, she made the same admissions to Mooney after she was Mirandized.

{¶ 38} Properly licensed Ohio lawyers are presumed competent. *State v. Banks,* 9th Dist. Lorain No. 01CA007958, 2002-Ohio-4858, ¶ 16. In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have

17.

been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

### 1. The Traffic Stop and the Detention that Followed

{¶ 39} Reynolds argues that trial counsel was ineffective for failing to file a motion to suppress evidence on the basis that the officer lacked reasonable, articulable suspicion to stop her for driving five-miles-per-hour over the speed limit and to detain her to administer field sobriety tests.

{¶ 40} Where a police officer has a reasonable and articulable suspicion of criminal activity, he or she may make a brief, investigative stop. *State v. Melchor*, 114 Ohio App.3d 534, 538, 683 N.E.2d 442 (6th Dist.1996), citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This court has recognized that "a 'de minimis violation of traffic laws' is generally sufficient to justify a stop." *State v. Clark*, 2018-Ohio-2029, 101 N.E.3d 758, ¶ 23 (6th Dist.), citing *State v. Dukes*, 4th Dist. Scioto No. 16CA3745, 2017-Ohio-7204, ¶ 16.

{¶ 41} In *Melchor*, we affirmed the validity of a stop even though the trooper testified that the defendant had exceeded the speed limit by only five miles per hour. *Id.* at 535. We found that the trooper had reasonable, articulable suspicion that the defendant was violating R.C. 4511.21 by driving over the speed limit. *Id.* at 538.

18.

{¶ 42} This case presents the same scenario. It is undisputed that Reynolds was traveling five miles per hour over the speed limit. While this was a fairly de minimis traffic violation—Palmer testified that he routinely exceeds the speed limit by five miles per hour and would not normally stop a driver for driving five miles per hour over the speed limit—it nevertheless provided Palmer with reasonable, articulable suspicion that Reynolds had violated R.C. 4511.21. This is true regardless of the fact that he did not ultimately cite her for this violation. *State v. Arms*, 6th Dist. Lucas No. L-97-1282, 1998 WL 114356, *3 (Mar. 6, 1998) ("Reasonable suspicion, based on specific and articulable facts, to conduct an investigatory stop after a police officer observes a traffic violation is not negated by the fact an officer does not issue a ticket after investigating.").

{¶ 43} Turning to Palmer's decision to perform field sobriety tests, Ohio courts recognize that these tests invade one's liberty interests, therefore, "'they must be separately justifiable by specific, articulable facts which show a reasonable basis for the request.'" *State v. Wright*, 2015-Ohio-2600, 38 N.E.3d 485, ¶ 52 (11th Dist.), quoting *State v. Evans*, 127 Ohio App.3d 56, 62, 711 N.E.2d 761 (11th Dist.1998). In *Wright*, the Court found that the officer had a reasonable basis for requesting the defendant to submit to field sobriety tests where he observed a marked lanes violation, there had been citizen reports that defendant was driving erratically, defendant's pupils were highly constricted despite the dark conditions, his responses to the officer's requests were extremely slow, and he acted lethargically. *Id.* at ¶ 54-57. *See also State v. Glime,* 9th

Dist. Lorain No. 01CA007856, 2001 WL 1339478 (Oct. 31, 2001) (finding probable cause to arrest for OVI even without results of field sobriety tests where officer observed defendant drive vehicle down center of road, he did not stop immediately upon the officer activating his lights and sirens, and he had glassy, bloodshot eyes and slow, slurred speech); *Smith*, 6th Dist. Ottawa No. OT-97-037, 1998 WL 102143, at *1 (trooper asked defendant to submit to field sobriety tests after observing that defendant's gait was unsteady, his balance was poor, his speech was slurred, and his eyes were red with constricted pupils).

{¶ 44} Here, Palmer testified that Reynolds's eyes were bloodshot and glassy, her speech was slurred, and her movements were lethargic. These observations provided reasonable, articulable suspicion for Palmer to ask Reynolds to submit to field sobriety tests. Accordingly, we conclude that there is no reasonable probability that the outcome of the proceedings would have been different if trial counsel had filed a motion to suppress evidence on the basis that the initial stop and the detention that followed were not justified.

### 2. The Administration of the Field Sobriety Tests

{¶ 45} Reynolds next argues that trial counsel was ineffective for failing to file a motion to suppress evidence on the basis that the field sobriety tests were not performed in substantial compliance with the standards for administering such tests given that the

20.

HGN was held for seven seconds instead of five, Reynolds had numerous medical problems, and the cold weather affected the tests.

{¶ 46} Ohio courts recognize that the time set forth in the NHTSA manual for completing the various elements of the HGN test are approximate.  (Citations omitted.) *State v. Scott,* 6th Dist. Lucas No. L-21-1128, 2022-Ohio-2071, ¶ 37.  Those times are set forth as "minimum" times, meaning that the HGN test may be compliant with NHTSA standards even when performed more slowly than the time specified in the manual.  *See State v. Embry*, 12th Dist. Warren No. CA2003-11-110, 2004-Ohio-6324, ¶ 38 (noting that stimulus must be held at maximum deviation for a *minimum* of four seconds); *State v. Clark,* 12th Dist. Brown No. CA2009-10-039, 2010-Ohio-4567, ¶ 23 ("[T]he NHTSA guidelines list certain approximate and minimum time requirements for the various portions of the test.").  Moreover, the standard for admissibility is substantial, not strict, compliance.  *State v. Emmons*, 5th Dist. Ashland No. 14-COA-016, 2014-Ohio-5842, ¶ 21.  We find that Palmer substantially complied with the minimum time requirements for performing the HGN tests, and Reynolds has not alleged any similar deficiency in Moomey's administration of the tests.

{¶ 47} As for Reynolds's claim that the cold weather and numerous medical problems—including left leg injury and pain, back injury and pain, lazy eye, and limping—greatly affected her performance on the field sobriety tests, Reynolds is not specific as to how her performance was affected.  *See State v. Hall*, 2d Dist. Clark No.

21.

05CA0006, 2005-Ohio-6672, ¶ 25 (explaining that officers' awareness of defendant's alleged physical defect "permitted Defendant to question the judgments the officer made concerning Defendant's performance of those tests in relation to the probable cause to arrest issue," but noting the absence of evidence on this point).

{¶ 48} In any event, Palmer testified that he told Reynolds she did not have to perform the walk-and-turn test because of her physical ailments, but she said she wanted to. Moomey similarly asked Reynolds if she wanted to continue with tests despite her claimed medical conditions and she said yes. *See State v. Hess*, 2d Dist. Champaign No. 2021-CA-11, 2021-Ohio-3755, ¶ 35 (observing that despite informing officer of "balance issues," defendant replied affirmatively when asked if he could complete the test as instructed). Palmer testified that Reynolds used her *right* leg to stand on during the one-leg stand test. Moomey had Reynolds perform both ways—balancing on her right leg, then on her left—and Reynolds lost balance both ways. And Palmer testified that despite the cold, "a normal person should have been able to conduct the test"; weather was not a factor in Moomey's administration of the tests Under these circumstances, we find that Reynolds has failed to demonstrate a reasonable probability that the outcome of the proceedings would have been different if counsel had moved to suppress the results of the field sobriety tests.

### 3. The Statements

22.

**{¶ 49}** Finally, Reynolds argues that trial counsel was ineffective for failing to file a motion to suppress evidence on the basis that the officer could not remember if he Mirandized Reynolds before she admitted that she was prescribed and used 14 medications.

**{¶ 50}** In *Miranda v. Arizona,,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), "the United States Supreme Court established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution." *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 8. "What are now commonly known as *Miranda* warnings are intended to protect a suspect from the coercive pressure present during a custodial interrogation." *Id.* at ¶ 9. "A custodial interrogation is 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *Id.,* quoting *Miranda* at 444. "If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt." *Id.,* citing *Miranda* at 479.

**{¶ 51}** Roadside questioning of a motorist detained pursuant to a routine traffic stop does not usually constitute a "custodial interrogation" for purposes of *Miranda*. *State v. Ferrell,* 2017-Ohio-9341, 91 N.E.3d 766, ¶ 28 (11th Dist.), citing *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Palmer was,

23.

therefore, not required to Mirandize Reynolds before asking her about her medications during roadside questioning.

{¶ 52} Additionally, although the audio is difficult to hear at times, it is clear that after Palmer arrested Reynolds and read her her rights, Reynolds volunteered information about her prescribed medications. Moreover, once Reynolds got to the station, before she was evaluated by Moomey, Moomey again read Reynolds her rights. After waiving those rights, Reynolds again provided information concerning what medications she was prescribed and when she last took each of those medications. As such, it would have made no difference in the outcome of the proceedings if counsel would have moved to suppress any pre-Miranda statements because Reynolds provided the same information again—twice—after being Mirandized.

{¶ 53} Accordingly, we find Reynolds's second assignment of error not well-taken.

### III.    Conclusion

{¶ 54} Reynolds's conviction was not against the weight or sufficiency of the evidence. The state presented evidence that Reynolds was operating a vehicle while under the influence of certain drugs of abuse, and we cannot say here that the jury clearly lost its way in resolving evidentiary conflicts in favor of the state. We, therefore, find her first assignment of error not well-taken.

24.

**{¶ 55}** Reynolds has failed to demonstrate that there was a reasonable probability that the outcome of the proceedings would have been different had trial counsel moved to suppress evidence of the stop, the further detention to administer field sobriety tests, the results of the field sobriety tests, or statements she made concerning her medications. We, therefore, find her second assignment of error not well-taken.

**{¶ 56}** We affirm the November 16, 2021 judgment of the Bowling Green Municipal Court.  Reynolds is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.          _____
                                                              JUDGE
Thomas J. Osowik, J.

                                                   _____
Christine E. Mayle, J.                                   JUDGE
CONCUR.

                                                   _____
                                                              JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.

26.